HONORABLE JOHN P. HOYT........................ DO DO

MR. R. G. O'BRIEN................................ CLERK.

## LYDIA A. MAYNARD *vs.* THOMAS B. VALENTINE.

1. If it be conceded, that the legislature has power to grant divorces, the power is plenary, and the courts are without authority to review its action in any particular case.

2. In creating a territorial government, Congress is vested with full power and may constitute this government in such form as it pleases, so long as it is not inconsistent with our republican national life.

3. The inherent distinctions between judicial and legislative power pointed out and defined; legislative power gives, while judicial power applies laws.

4. The state has a paramount, permanent and controlling interest, not only in the institution of marriage, but in the particular marriage contracts that bind individuals within its jurisdiction, even though formed outside of its limits; and because of *such* interest, it may, through its legislature, dissolve a marriage, not only without notice to, but even against the will of the parties thereto, unless in the organic law of the state, there be a limit placed upon its legislative power.

5. The unlimited legislative power inhering in the British Parliament is in our American legislatures restricted by federal and state constitutions.

6. The phrase "rightful subjects of legislation" in the Organic Act of the Territory of Oregon, means subjects at the time of its passage sufficiently defined by the general consent and practice of the people who in Congress made use of it, and this meaning, at that date, as gathered from written constitutions, statutes and adjudications, shows both marriage and divorce to be rightful subjects of legislation, except in case of express constitutional provisions to the contrary. Our Legislative Assembly may grant a divorce in any case it may see fit without subjecting its action to review by the courts.

7. The clause in the Constitution of the United States, forbidding any state to pass laws impairing the obligations of contracts, does not contain within its purview the unique contract of marriage; while the phrase in the Ordinance of 1787, forbidding the passage of laws that "shall in any manner interfere with or affect private contracts or engagements," is even less restrictive; nor does the clause forbidding the primary disposal of the soil in any wise affect the question of divorce—in this case.

8. The right of the wife, under the 4th Section of the Donation Act, is merely inchoate, until the requirements of that act, in residence cultivation and other respects have been complied with.

9. That statute contemplates settlement and residence by the wife, as well as the husband. Might not the wife reject this gift of the government by refusing to partake of the husband's domicile, *quære.*

Appeal from the Third Judicial District, holding terms at Seattle.

*C. H. Hanford* for appellant.

The powers of territorial legislatures are *limited* not general. 1 Kent's Com. 384; Cooley on Const. Lim. 28; Story on the Const. §§ 1324–5, *Am. Ins. Com.* v. *Canter,* 1 Pet. 511; *Clinton* v. *Englebretcht,* 13 Wall. 441; *Reynolds* v. *U. S.,* 8 Otto, 145; *National Bank* v. *County of Yankton,* 11 Otto, 129; *Griffin* v. *Nichols,* 1 W. T. R. 374.

The legislative power granted to the territories extends only to *rightful* subjects of legislation. Gen. Laws of Oregon, p. 55, § 6. (9th St. at Large, 323.)

The general sentiment of the legal profession and of the people is against the *rightfulness* of special legislative divorces. Cooley on Const. Lim. 113—ib. 110, note 2.

Congress has condemned the practice of granting divorces by territorial legislatures. 2 Kent's Com. 105, note C.

There are implied as well as express constitutional limi-

tations of the legislative power. Cooley on Const. Lim. 85, 174; Bateman's Const. Law, § 192.

The enactment of a special law for a particular case is an arbitrary exercise of power, and is unconstitutional, and a great wrong when it affects the marriage relation. Cooley on Const. Lim. 90–91–175–176–188–391–109–114, note 3; 1 Kent's Com. 448, 2 ib. 76, 106–118, note 2; Story on Confl. of Laws, §§ 108, 200; Schouler on Dom. Rel. 22; Sedgwick on Const. & Statutory Law, 635–516; Smith's Com. 415, *State* v. *Fry*, 4 Mo. 120; *Bryson* v. *Campbell*, 12 Mo. 498; *Bryson* v. *Bryson*, 17 Mo. 590; *Chouteau* v. *Magenis*, 28 Mo. 187; *Lewis* v. *Webb*, 3 Greenl. 326, *Dunham* v. *Lewiston*, 4 Greenl. 326; *Holden* v. *James*, 11 Mass. 396; *Simonds* v. *Simonds*, 103 Mass. 572; *Bingham* v. *Miller*, 17 Ohio, 445; *Ponder* v. *Graham*, 4 Fla. 23; *Clark* v. *Clark*, 10 N. H. 387; *Carson* v. *Carson*, 40 Miss. 349.

The whole judicial power is vested in the courts and the exercise of judicial power by the legislature is prohibited. Cooley on Const, Lim. 87, 95, 174; 1 Kent's Com. 291; Story on the Const. § 1592.

The Government cannot rightfully sever the marriage relation of individuals without sufficient cause; and it is a judicial function to ascertain and declare the existence of the cause; Schouler on Dom. Rel. 205; 2 Story on the Const. (4 ed.,) § 1397 and note; 1 Bishop on Marriage and Divorce, § 678 and 681 to 693; *Dartmouth College* v. *Woodward*, 4 Wheat 629–695–696; *Maguire* v. *Maguire*, 7 Dana, 183; *Cronise* v. *Cronise*, 54 Penn. St. 255; *Adams* v. *Palmer*, 51 Maine, 480; 9 B. Monroe, 90; 1 Bishop on Marriage and Divorce, § 662–3–4; 1 Wendell's Blackstone's Com. 441, note 20; Macqueen on Parliamentary Divorce, 551; 3 Am. Law Review, 27.

The provisions of the Ordinance of 1787 are incorporated into the Organic Law of Oregon. Gen. Laws of Oregon, p. 59, §14.

That ordinance, for the "just preservation of *rights and property*," prohibits legislation interfering with or affecting private *contracts or engagements*. This is a more comprehensive prohibition than the clause of the Federal Constitution

forbidding laws impairing the obligation of contracts which has been construed to apply only to contracts by which private *rights of property* are vested; *Butler* v. *Penn*, 10 Howard, 402–416.

Marriage is a contract. Story on Confl. of Laws, §108; Story on the Constitution, § 1394.

A divorce is invalid as to a party not at the time domiciled within the state and not appearing as a party to the proceeding. Cooley on Const. Lim. 128; Story on Conflict of Laws, §§ 20—538; 2 Kent's Com. 117, notes; *Pennoyer* v. *Neff*, 5 Otto, 722; *People* v. *Baker*, 10 Central Land Journal, 171, (N. Y. Court Appeals, Jan. Term, 1880.)

The domicil of the husband is not the wife's after separation. 2 Bishop on Marriage and Divorce, § 128 a; Freeman on Judgments, § 582; *Cheever* v. *Wilson*, 9 Wall. 108.

Under the Oregon Donation Law, the wife of a settler solely by virtue of wifeship, without herself going upon the land or residing within the Territory, is entitled to a donation equally with her husband. 10 Opinions of Atty. General, 381; *Van Dolf* v. *Otis*, 1 Oregon, 153; *Meek & Luelling* v. *U. S.*, Decision of Secretary of the Interior, June 1, 1875; *Vance* v. *Burbank*, 11 Otto, 514; *Stark* v. *Starrs*, 6 Wall. 408.

However the divorce act may affect the parties in their relation to each other, it can not affect their property rights. *Gaines* v. *Gaines*, 9 B Monroe, 295—307.

The Oregon Donation Law is a benevolent act; it is to be liberally construed. *Silver* v. *Ladd*, 7 Wall. 227.

*Burke & Rasin* and *John R. Wheat* for Appellee.

The history of legislation upon the subject shows the authority of legislatures to grant special acts of divorce has been, when not restrained by constitutional inhibition, seldom or never questioned. 1 Bishop on Marriage and Divorce, Sects. 661 to 664; *Maguire* v. *Maguire*, 7 Dana, 184; Cooley's Constitutional Limitations, 110.

The provision in the Federal Constitution, forbidding the enactment of laws impairing the obligation of contracts, does

not prevent such legislation.  1 Bishop, Marriage and Divorce, Sects. 3–12, 664–669; Story on Conflict of Laws, Sects. 108 and 200; 16 Maine, 481; *Berthelemy* v. *Johnson*, 3 B. Monroe 90; *Bingham* v. *Miller*, 17 Ohio, 445; *Lewis* v. *Sleator*, 2 Greene Iowa, 604; *Adams* v. *Palmer*, 51 Maine, 480, *Cronise* v. *Cronise*, 54 Penn St. 255; Cooley on Const. Lim. 110; *Maguire* v. *Maguire*, 7 Dana, 184; Bishop on Marriage and Divorce, Sects. 680–686, *Storr* v. *Pease*, 8 Conn. 541.

The fact that this statute has so long been upon the statute book, which was submitted to Congress, creates a presumption of its approval by that body.  *Clinton* v. *Englebrecht*, 13 Wallace, 434.

Appellant acquired no property under the Donation Act, and was not by this divorce therefore deprived of any property right.  Cooley's Con. Lim. 114; 1 Bishop, Marriage and Divorce, Sect. 693.

The husband's domicil being in Oregon, the presumption of law is, the wife's was there also.  2 Bishop, Marriage and Divorce, Sect. 125–126; *Green* v. *Green*, 11 Pick. 440; 2 Bishop, Married Women, Sect. 157.

*Opinion by Greene, Chief Justice.*

Appellant was married to David S. Maynard about 42 years ago, in Vermont.  She bore him two children, and in 1850 was living with him and them, in Ohio.  Sometime in that year her husband left her with the children there, and became himself a resident of Oregon.  When leaving he promised his wife that within two years he would return for her or send her the means to come to him.  He never kept this promise.  In 1852, under the act of Congress, commonly known as the Oregon Donation Law, he, as a married man, settled upon and claimed 640 acres of land, lying within what is now known as King County in Washington Territory.  Afterwards and on the 22d of December of that year, the Legislature of the Territory of Oregon by special act, declared the bonds of matrimony between David S. Maynard and the appellant dissolved.  This act of the Legislature has never been assented to by appellant.  It was passed without notice to her before she had

ever been in Oregon, and when no cause of divorce as against her existed.

The notification pursuant to section 6 of the Donation Law was filed by Maynard in October, 1853. His accompanying affidavit recited the existence of his marriage relation with appellant until December 24th, 1852, her death at that date and his marriage on the 15th of January, 1853, to Catherine T. Brashears. Maynard's residence as a donation settler was duly completed and proved by May, 1856, and in January, 1869, Donation Certificate, No. 436, was issued from the local land office at Olympia to him and his wife Catherine, apportioning the east half to her and the west half to him. As to the wife's half the Commissioner of the General Land Office, subsequently, in July, 1871, held this certificate to be erroneous, and on the supposition that appellant was dead and that her heirs were entitled, he directed that proof of her marriage should be taken and that upon proper proof of this marriage, the certificate should be amended so as to run to her heirs. A hearing was accordingly had before the Register and Receiver at Olympia, at which appellant appeared in person, and David and Catherine Maynard by attorney. As a result the certificate was, on the 8th of April, 1872, so modified as to allot the east half of the claim to appellant. Upon appeal to the Commissioner of the General Land Office, and from him to the Secretary of the Interior, it was held that the special divorce act of 1852, shut appellant out from any rights in the premises, and that neither she nor Catherine Maynard could claim anything under the Donation Law. Conformably to this decision the east half of the 640 acres was thrown open as public land to entry and sale, and of part of it Valentine, the appellee, became the purchaser and patentee from the Government.

Such are the facts as averred by the appellant in her complaint filed in the District Court. Upon them she asked a decree that appellee holds title as trustee for her benefit, and that he be required to convey to her and that she have her costs and general relief. Appellee filed a general demurrer, which the District Court sustained. A decree was thereupon

entered dismissing the case at plaintiff's costs.   From that de-
cree this appeal is taken.   The issue made by the demurrer has
been argued before us with commendable zeal and thoroughness,
and we have derived great assistance from the skill and in-
dustry of counsel.   Authorities cited have had our careful atten-
tion and reflection.   Especially valuable we have found the
observations of Mr. Bishop, in his excellent treatise on Marriage
and Divorce, and those of Judge Cooley, in his work on Con-
stitutional Limitations.

The expediency of allowing legislatures, so constituted
and related to the people as are those of this country, the
power of divorce, has been long a mooted question.   It would
be an exceedingly interesting and momentous one for a consti-
tutional convention, or a Congress, organizing a new Territory,
to debate.   We are conscious ourselves of very strong private
convictions against the expediency.   But in this opinion we
shall endeavor to stand so far aloof from these convictions as
dispassionately to arrive at the powers actually conferred upon
the Legislature of the Territory of Oregon.   Two principal
questions are presented for our decision: 1st.   Is the legislative
act of divorce valid?   2nd.   If valid, does it operate to exclude
appellant from the benefit of the Donation Law?   For the cor-
rect decision of the first question everything turns on
the power of the Legislature to divorce at all.   If there
was legislative power to enact any divorce, then it seems to
us there was power to enact this particular one.   To be sure
there are circumstances in this case, tending to illustrate the
subject of legislative divorces, and to lead the mind to canvass
the expediency of allowing them in any instance.   Our atten-
tion is invited to the fact that this divorce was accomplished
by a special act of the Legislature.   But if a legislature be
clothed with power to divorce at all, how else is it to exer-
cise the power save by a particular act for the particular case?
Shall it pass a general statute declaring that whenever one of
two married persons deserts, or becomes a drunkard, or com-
mits adultery, or ceases to be amiable, then and thenceforth the
two shall stand divorced?

It is further pointed out, that here was an act done which disposed of the wife's dearest interests, in her absence, without her knowledge, against her will, and without inquiry. Granting all this to be as stated, and even that no legislature could rightfully so act, yet, if these circumstances do not clearly appear upon the face of the enactment, must it not be conclusively presumed that the legislature has done whatever was right and becoming in the premises, has made inquiry, has found fit facts on which to base its action, and has not exercised a discretion which belongs to it and to it exclusively, except upon full information and for just cause? Could this Court sit as a tribunal of review to investigate and redress the acts of the Legislature in the exercise of its legislative discretion? Can we inquire into the fidelity of the legislative body to the trusts reposed in it by the people, and if in our opinion it was unfaithful, then pronounce its doings void? Certainly our courts are not constituted with any such functions.

We are sent back to the original question. Was there a divorcing power seated in the Legislature? It is not a question of whether it was politic and wise to have it seated there, but was it there? This is to be determined by a reference to the powers granted to the Legislature by the Organic Act of Oregon.

These powers are not limited by virtue of any limitation operative upon Congress. Congress could constitute as it pleased the Territorial Government, provided the form it pleased to give was harmonious with the fundamental idea of our national life, that is to say, republican. Whether this ability of Congress be derived from the clause in the Constitution authorizing the making of all needful rules and regulations respecting the territory belonging to the United States, or springs under the last clause of section 8, article 1, as a logical necessity from the power to acquire and occupy territory, needs not be discussed here. The power existed, and the power was plenary. Congress might have chosen not to parcel out into three separate and clear-cut departments the legislative, executive and judicial functions. It might have imposed on

the legislature much business ordinarily done by a court. Or, it might have devolved all legislation upon the governor or the judiciary. It saw fit, however, to distribute the governmental business into executive, legislative and judicial departments. This it did, doubtless, in analogy to the forms of constitution prevailing throughout the States of the Union. The mere distribution has significance in every inquiry as to what the legislature may constitutionally do. Under such a distribution the judiciary cannot take upon itself the functions of the legislature, nor can the legislature do that which properly belongs to a court. But does it logically follow, that a fact, such for example as the dissolution of a marriage, which might be effected as the conclusion of the action of a court of justice, cannot lawfully be brought about immediately by the legislature?

We would not be understood to confound the provinces of court and legislature. A distinction exists between the two bodies, and it is a radical distinction. It does not seem to us to arise from dissimilarity of the subject matters treated, nor from dissimilarity of modes of procedure, nor yet from dissimilarity of results attained. Legislators and judges both deal with men and things as socially and politically related. Neither can act well without understanding, deliberation and judgment. If inquiry be necessary to inform the understanding, then there must be inquiry also. Inquiry may be made and all proceedings conducted under the same forms, and the same end may be reached in one body as might be in the other. And yet all this will not change a court to a legislature, nor metamorphose a legislature into a court. It is said that a legislature may be arbitrary; but so may a court. So, too, both legislatures and courts may be mistaken about facts. But every good piece of legislation, as well as every sound judicial decision, is a piece of good judgment naturally resulting from fair deliberation applied to trustworthy facts. The true distinction between a legislature and a court is not to be found in subject-matter, processes or results. Legislation and adjudication might be confided to the same body, and yet the distinction would re-

main intact.   It could not be destroyed without destruction of one or the other function.   For it consists in  diversity of  the deep seated organic relations, which court and  legislature respectfully bear to the central sovereignty which speaks and acts through them.

The sovereign power, through its legislative organ, speaks spontaneously, and imposes on that organ no obligation to reply to any petition; it speaks through its courts upon petition only, and obliges its courts to  answer  every  petition.   The voice of the court  is  explanatory  and  assertive of that of the legislature; the voice of  the legislature is determinative of that of the  court.    Legislatures  declare  about persons and  things in general, and in particular what the sovereign will is.   Courts declare what, according to that will, the  parties before  them are  bound  or  free  to  do  or  suffer.    In  fine, the legislature  gives,  the court applies,  the law.   The sovereign's will is sovereign will, to  which  when  expressed  all  must conform.   If the sovereign has a will, and wishes spontaneously to announce it, there is no organ but the law-giving body through which  to  do  it.    One might  inconsiderately  and pertly say, that the State has no business to have any will about what are called the private contracts and relations of individuals within it, or if it has a will no business to utter  it  until appealed to by a party privately interested, and  then not until due notice to all parties privately concerned.   Private sovereignty as to private affairs is, however, an idea that does not consist with the idea of  political association.    Speaking  with accuracy, a sovereign commonwealth may be truly said to have an interest in every act, every contract, and  every  relation of every individual that composes it.   Itself is a party, by its sufferance or promotion, to every  act,  every  contract, and  every  relation which exists under the allowance or direction of its laws.   Being such a party, it may truly be said to have  engaged  to allow or or promote everything its laws allow or  promote.   But its engagements with individuals are all subject to  its supreme engagements with them all, whereby both it and they are to seek the welfare of the community as  a  whole.   This subjection of

every private affair to the general good is imported into every contract, and involved in the very notion of allegiance. The State or commonwealth has an interest not only in the institution of marriage, but in the particular marriage contracts which bind those within its jurisdiction, no matter under what jurisdiction those contracts may have been originally formed. Its interest is a paramount interest. Paramount not merely in the sense of being highest in dignity, but in the sense of including, duly weighed and proportioned, all private interests whatsoever to make up the aggregate and resultant which itself is. Because paramount, it must be controlling. State will may be very decided, and urgent that a particular marriage be dissolved, even against the will of the private parties to it. Suppose, in England a nobeman of high rank, heir presumptive to the crown, had for wife a Messalina. Would anyone, however much opposed to the policy of promiscuous and frequent legislative divorces, say that such was not a case in which the nation, through its legislature, as legislature, could spontaneously utter its will about that marriage? *Salus populi suprema lex.* What the welfare of the people demands, whether it consume property, obliterate contracts or destroy life, it is perfectly competent for a legislature of unbounded powers to do.

But of course there is a difference between legislatures with defined and legislatures with undefined powers, and the difference is one of range of power. A legislature with undefined powers has all legislative powers. It can lay down the law in every direction, moulding all persons and things, and each particular person and thing conclusively to what it says, determining absolutely and finally every question by its fiat. Its voice is the voice of the governing power, and the voice of the governing power is the voice of God. From that there is no appeal. Great Britain's Parliament is an example of such a Legislature. And British Parliamentary divorces, which are indisputably legislative, are examples of such legislation. American legislatures are different, simply because limited. Higher legislation than any one of them is capable of has at one breath called them into being and circumscribed their

activities. The National and State legislatures have their bounds set by what the people have enacted in the National and State constitutions. The Legislature of Oregon Territory had its powers granted and restrained by the act of Congress creating it. That act granted to the Legislature, with certain exceptions, a legislative power extending to "all rightful subjects of legislation, not inconsistent with the constitution and laws of the United States" (9 stat. 325, s. 16). Aside from the special circumstances of this case, which have been already alluded to and disposed of, we understand it to be conceded in argument, that if granting a divorce was acting upon a rightful subject of legislation, and not inconsistent with the Constitution and laws of the United States, then it was a legitimate exercise of power under the Organic Act. We will first discover, if we can, whether it was a rightful subject of legislation within the sense that must be accorded to that phrase, and afterwards proceed to inquire whether it was inconsistent with the constitution and laws of the United States.

The language of the Organic Act, declaring that the legislative power shall extend to all rightful subjects of legislation, implies that there are some subjects of legislation that are not rightful. What are rightful and what are not, Congress has not undertaken to define. Are we, therefore, to understand that to us, as a Court, is referred for discussion and determination the fundamental political question, what subjects in a distributive and complex form of government like ours, it is expedient that a limited Territorial legislature should be permitted to act upon and what it should not be permitted to touch? Or are we to understand, that by the phrase, "rightful subjects of legislation," are meant subjects already sufficiently defined by the general consent and practise of the people who in Congress have mentioned them? We think the latter. That which the words "rightful subjects of legislation" stood for, in the mind of the people at the time they were speaking them, is the meaning that belongs to them in this statute, and is the meaning we must regard. To find it out, we have recourse to the most solemn and authoritative utterances current among the people,

namely, their written constitutions, statutes and adjudications. From these we gather that the people of the United States, at the date of the Organic Act, thought, and still think, individual marriages to be rightful subjects of legislation, and legislative divorces valid, unless there be some express constitutional provision to the contrary. This seems to us conclusively to establish the proposition that the Territorial Legislature, in passing this special act of divorce was acting upon a subject, which within the the true sense of the Organic Act, was a rightful subject of legislation.

Thus far, we have considered the phrase "rightful subjects of legislation," as if the word "legislation" stood in the statute unqualified. In fact, according to the tenor of the act, "legislation not inconsistent with the Constitution and laws of the United States," is the only range of legislation to rightful subjects whereof the legislative power is extended. We come, therefore, to inquire whether the divorce act was inconsistent with any provision of the constitution or laws of the United States. An inconsistency is suggested with only one clause of the Constitution. It is the clause forbidding any State to pass any law impairing the obligations of contracts. Const. Art. 1, s. 10. Adhering to the analogy between the State governments and Territorial governments laid down in the case of *The Panama* (1 Wash. Terr'y 518, 525), we are prepared to hold, that whatever it would be inconsistent with the Constitution of the United States for a State legislature to do, it would also be inconsistent for a Territorial legislature, under an Organic Act like that of Oregon, to do.

If the marriage contract between Maynard and appellant contained obligations such as the constitution prohibits any State by law to impair, and the contract could not be set aside without impairment of those obligations, then it was one that the Legislature of Oregon never had power to annul. But we are of opinion that the contract of marriage was not within the purview of the constitutional clause. Not but that we believe a marriage to be a contract. It certainly is a very important contract. It not only most intimately affects the

married persons in their private affairs, but it changes their social and political status. It brings them into new relationships to the society and to the state; relationships which wise lawgivers have oftentimes recognized with favor and distinction. It is so peculiar in its office and effects that when ordinarily, contracts are talked of, no reference is understood to be made to the contract of marriage. It is so unique that if all contracts possible were to be classified scientifically into varieties, species, genera, classes, etc., it would stand alone in the most comprehensive subdivision to which it should be assigned. Ever since the adoption of the Federal constitution, the general current of legal opinion in this country, as evidenced by law writers, legislative enactments and judicial decisions, is opposed to the idea that the provision against impairing the obligation of contracts had any bearing upon marriage. It is not necessary to cite from the numerous text writers. Their opinions upon this point are well nigh unanimous. The legislatures of the various States have from the date of the constitution, continued to pass divorce acts unconscious of restraint. The State courts have upheld such acts, and under State statutes, creating causes of divorce, have granted divorces upon grounds which, at the time of marriage, were not good in law.

In "*Butler* v. *Pennsylvania* (10 How. 402, 416), the Supreme Court of the United States, through Daniel, J., say "The contracts designed to be protected by the 10th section of the first article of the Federal Constitution are contracts by which perfect rights, certain definite, fixed, private rights of property are vested." According to this definition, property rights which are not still inchoate or imperfect, and which become vested by marriage, and only such rights could not be constitutionally divested by dissolution of marriage. Such rights no divorce act avails or professes to divest. The act divorcing Maynard from appellant did not profess to divest any such rights, nor did it accomplish any such divestiture. If the rights existed it would not be necessary to maintain for the future the marriage in order to maintain the rights. Such rights are freely separable from such a contract as that of mar-

riage, and may be preserved without preserving any future marital relations between the parties. It is, therefore, untenable, that the act professing to snap the marriage tie is void, because impairing the obligations of a contract.

But appellant argues that if the act be not void for inconsistency with this constitutional provision, it is for inconsistency with two clauses of the ordinance for the government of the territory northwest of the river Ohio, commonly called the Ordinance of 1787. By the 14th section of the Organic Act, all the provisions of that ordinance were extended over Oregon, so that any inconsistency with those provisions would be doubtless an inconsistency with the laws of the United States. The last clause of Article II of the ordinance declares "that no law ought ever to be made or have force in said Territory that shall in any manner whatever interfere with or affect private contracts or engagements, *bona fide*, without fraud previously formed.". This is the first clause on which appellant bases her argument. We take it that the language of the article is intended, like that of the constitutional provision we have been considering, to forbid the passing of laws which would impair rights of property vested under private contracts or engagements. We see no reason why the phrase "private contracts or engagements," here occurring, should have more compass given it than the word "contract," in the Constitution. Perhaps some restrictive force should be allowed to the word "private." If so, then it may be worth while to notice that contracts relating simply to property or service can be privately made and privately rescinded, varied or released. They are left perfectly within the control of the private parties concerned. Not so, among us, with the contract of marriage. In that, as soon as formed, the State asserts its interest as controlling, and permits no rescission, variation or release, save by its own express consent. But whatever office be assigned to the word "private," we are clear that the clause under consideration was not intended to apply to the contract of marriage. The act by which Maynard and his wife were divorced is, therefore, not obnoxious to the charge of inconsistency with that clause. In the fourth

article of the ordinance, it is provided that the Territorial Legislatures "shall never interfere with the primary disposal of the soil by the United States in Congress assembled, nor with any regulation Congress may find necessary for securing the title in such soil to the *bona fide* purchasers."

Appellant contends that the act of the Oregon Legislature divorcing appellant is inconsistent with this provision also. But we are unable to perceive how the divorce could interfere with the primary disposal of the soil of Oregon, or with any Congressional regulations for securing title to purchasers. The act does not stand in the way of Congress securing title as it pleases in appellant of any land which she may, by money, service or residence, *bona fide*, purchase. It does not propose to dispose of the soil, nor qualify a disposition already made. All it does at the most is to change the relations of two parties between themselves; that they are no longer husband and wife. It no more interferes with the disposal of the soil than a public act providing for the granting of divorces by the judiciary would. Whether the divorce was effected by court or by legislature, the primary disposer of the soil, recognizing the fact and freely acting with it in view, might be unwilling to bestow upon her who is no longer a wife, land that he was minded to give not to her particularly, but to whoever actually and lawfully filled the wife's place.

This brings us to the verge of the second question proposed at the outset. Its solution depends on the applicability of the provisions already noticed of the Federal Constitution and the Ordinance of 1787, touching the inviolability of contracts. The question is this: Had the appellant, as Maynard's wife, at the time of the divorce act, any perfect right of property to the land in controversy vested in her which the operation of that act must not be suffered to impair? She asserts that such a right was then hers under the provisions of section 4, of the Donation Law. But by that section the donation of six hundred and forty acres, one-half to himself and the other half to his wife, to be held by her in her own right, is given to that married man only *"who shall have resided upon and cultivated*

*the same for four consecutive years, and shall otherwise con-form to the provisions of this act.*" It needs but little consideration of the terms of such grant to perceive that the right of the wife does not become perfect nor vest under them until the residence and cultivation by her husband, as her husband, is complete. Her husband's title is imperfect and inchoate till then, and how can hers be more?

The statute, moreover, contemplates, we think, a common residence and settlement by husband and wife "in all cases." It reads: "Where such married persons have complied with the provisions of this act, so as to entitle them to the grant as above provided, whether under the late provisional government of Oregon, or since, and either shall have died before patent issues, the survivor and children or heirs of the deceased shall be entitled," etc. In argument before us, the wife claims that her domicile never was in Oregon. If this be granted, it is difficult to see how, within the spirit of this generous law, a law intended to foster and reward actual and conjoint settlement, she can proceed to claim even an incipient right to land under that law. Probably the law should not be held to compel wives to accept a gift. If they can refuse, what is so decisive proof of intent to refuse as a refusal to be considered partaker of the husband's domicile? Doubtless double donations were offered to promote double settlement. The aim was to plant and endow families in Oregon.

Upon the whole case, we are of opinion that the judgment of the District Court must be AFFIRMED.