# CASES

# SUPREME COURT

OF

# WASHINGTON

[No. 12891. Department One. August 17, 1915.]

## G. H. UHLER, *Appellant*, v. THE CITY OF OLYMPIA, *Respondent*.[1]

MUNICIPAL CORPORATIONS—DEBTS—LIMITATIONS—BONDS — SPECIAL FUNDS. A bond issue under the special statute providing for the acquisition of water works, where the ordinance provides that the cost shall be paid out of the gross revenues of the system when acquired, is not a municipal debt, to be considered in estimating the debt limit of the city.

SAME—PUBLIC IMPROVEMENTS—WATER WORKS—ACQUISITION—PROCEEDINGS—ORDINANCE. An ordinance submitting to the electors a bond issue for the acquisition of water works is not objectionable in that it is not a positive declaration upon the part of the city, but is made dependent upon a subsequent ratification by a vote of the people, where the statute (Rem. & Bal. Code, § 8006) requires the same to be so submitted and ratified.

SAME — WATER WORKS—ACQUISITION—PROCEEDINGS—ISSUANCE OF BONDS—CHANGE OF PLANS. Under Rem. & Bal. Code, § 8005 *et seq.*, empowering cities to acquire public utilities in either one of two ways, viz: (1) by the issuance of general bonds or warrants, or (2) by the creation of a special fund to be sustained by the gross revenues of the system out of which special bonds are to be redeemed, a city having adopted the latter method and secured the voters' assent to a special bond issue of "$90,000 as near as may be" "to condemn, purchase, acquire, add to, maintain, conduct and operate" the system, and limited its bond issue to that sum, it is without power, by a subsequent ordinance, to pay from the general fund $4,500 for the cost of preparing the bonds, legal expenses, commissions, and cost of making extensions and necessary repairs; $90,000 being more than the purchaser of the bonds was willing to

[1]Reported in 151 Pac. 117; 152 Pac. 998.

advance upon the security of the water system; since the manner of payment was an essential part of the plan to be submitted to the people, and cannot be subsequently changed.

SAME—ISSUANCE OF BONDS—RATE OF INTEREST—COMMISSIONS— VALIDITY. Under the statute requiring cities to issue and sell its bonds or warrants in payment for a public utility "bearing interest at a rate not exceeding six per cent per annum" the city cannot issue bonds of the face value of $90,000, bearing interest at six per cent, and pay to the purchaser the sum of $4,500 out of the general fund (as a commission) under the pretense of meeting incidental expenses of the issue; since the same is plainly a device to pay a greater sum for the use of the money loaned than the statute permits.

SAME—RATE OF INTEREST—USURY. Such a transaction would be illegal as usurious; especially where it appears that the $4,500 was in excess of and grossly disproportionate to any actual cost or expense that would be incurred or paid out for the expenses mentioned.

SAME—WATER WORKS—ACQUISITION—METHOD OF PAYMENT—ADDITIONAL EXPENSES—ISSUANCE OF BONDS. Where a city, in acquiring water works, has adopted the plan of paying for the same by bonds to be paid out of the gross revenues of the system, any commissions to be paid on the sale of the bonds, if legal, and the cost of preparing the same, as well as the cost of expert witnesses incidental to the condemnation proceeding, must be charged to and paid only out of the special fund, and the general fund of the city is not liable therefor.

SAME—ADVANCES FROM GENERAL FUND. In such a case, payments out of the general fund for such purposes cannot be sustained as an advance or loan, to be paid back out of the revenues of the system.

SAME — ACQUISITION OF WATER WORKS — PAYMENT FROM GROSS REVENUES—PROFITS. The statute authorizing a city to condemn water works under the special fund plan, to be paid for out of the gross revenues of the system, does not allow the system to be used as a money making venture, the citizen being entitled to the best possible service at the lowest possible price.

SAME—GROSS REVENUES—RENTALS FOR CITY USE. Where water works are acquired by a city under the special fund plan, to be paid for out of the gross revenues of the system, the general fund of the city may be charged with the payment of a fair rate for rentals for the water used by the city as a municipality.

SAME — PUBLIC WORKS — ACQUISITION — BONDS — SUBMISSION TO ELECTORS. Where the voters have authorized a bond issue for the

acquisition of water works, under an ordinance limiting the issue to "$90,000 as near as may be," the city council is without power to repeal the ordinance limiting the issue or to increase the expenditure in any substantial sum, as ten per cent, or in any sum that a court could not ignore under the maxim, *"De minimus non curat lex."*

SAME. In such a case, it would be immaterial that the original ordinance provided that, in the event that a larger sum was necessary to carry out the purposes of the ordinance, the issue of bonds in the total amount necessary shall be provided for by supplemental ordinance; since the same violates the spirit and intent of the act authorizing the city council to provide for the submission of the amount of the bond issue to the decision of the people.

Appeal from a judgment of the superior court for Thurston county, D. F. Wright, J., entered May 27, 1915, upon sustaining a demurrer to the complaint, dismissing an action to enjoin the issuance and sale of special fund water bonds. Reversed.

*Ballinger, Battle, Hulbert & Shorts,* for appellant.

*George R. Bigelow* and *P. M. Troy,* for respondent.

CHADWICK, J.—This is a suit to test the validity of a series of bonds issued by the city of Olympia, under the act of 1909, Laws of 1909, p. 580; Rem. & Bal. Code, Title LX, Ch. XXXIII, § 8005 *et seq.*

The city of Olympia purposed to purchase, by way of condemnation, a water works plant within the city of Olympia. It passed an ordinance declaring its purpose and providing for the payment therefor, "in the event the qualified voters at the said special election shall ratify the same," by the issuance of special bonds payable only out of the fund to be created and established for the payment of the same.

An election was thereafter duly held and the plan was adopted by the voters, whereupon the city passed an ordinance declaring its intention to condemn the plant. The estimated cost, as declared in the ordinance submitting the plan to the electors, was fixed at the sum of $90,000, as near as may be. Among other things, it was provided that the cost

of purchasing, adding to, maintaining, conducting and oper-
ating the water works should be paid out of the gross reve-
nues received from the operation of the plant, including a
fair charge for water used by the city. A trial was had to fix
the value of the property. The jury returned a verdict of
$88,500, with costs taxed at $376.30.

It was contended by the purchasers of the bonds that, under
the terms of the first ordinance and by sections 7 and 9
thereof, the city might issue bonds in an unlimited amount
against the water works plant, and, therefore, at their in-
stance, as we were told in argument, the city passed an ordi-
nance fixing the limit of the bond issue at $90,000 and no
more. It is admitted that, in addition to the amount of the
judgment and costs, the city has agreed with the purchasers
of the bonds to pay out of the general funds of the city the
sum of $4,500 by way of commissions and compensation to
cover the cost of the preparation of bonds, legal expenses,
etc. From an order sustaining a demurrer to the complaint,
plaintiff has appealed.

Many questions are raised in the record, one of which is
that the bond issue, if permitted, will carry the city beyond
its limit of indebtedness. We think that bonds issued under
the special statute providing for the acquisition of a public
utility, where the ordinance provides that the cost shall be
paid out of the gross revenues of the system when acquired, is
not a thing to be considered in estimating the debt limit of
the city. The charge is upon those who use the water and
not upon others. The revenues to be received under the plan
proposed are not moneys of the city. They do not partake
of the character of general funds, nor can the general fund
be invaded if they are not sufficient. The system for collect-
ing revenues and for the payment of these special bonds pro-
vided by statute and by the ordinance, is in principle the
same as if they were collected to pay street assessments.

In speaking of special improvements and assessments to pay
for them and the character of the moneys collected thereon,

we said in *Seattle v. Stirrat*, 55 Wash. 560, 104 Pac. 834, 24 L. R. A. (N. S.) 1275, that such power

". . . has nothing to do with the raising or disbursing of the public revenue . . . Such laws, whether they be general or special, can have no reference to such funds as may come to a municipality through methods with which the public as a whole has no concern. . . . Our reasoning further finds assurance in the fact that indebtedness incurred for these purposes has been held to be no part of the general indebtedness or funds of a municipal corporation."

The law and the ordinance provide that the bonds shall be paid without invasion of the general fund, and our holding in the *Stirrat* case seems to be apposite to the present situation. It has been generally held, and the rule is, that the debt limitation does not apply to a debt that is a lien upon specific property and is not chargeable to the general fund. *Dean v. Walla Walla*, 48 Wash. 75, 92 Pac. 895.

The first objection to the bonds is that the ordinance is not a positive declaration upon the part of the city, but is made to depend upon a subsequent ratification by a vote of the people. The statute says that the council shall "provide therefor by ordinance which shall specify and adopt the system or plan proposed, . . . and the same shall be submitted for ratification or rejection to the qualified voters." Rem. & Bal. Code, § 8006. The validity of the issue depends, in any event, upon a vote of the people, and it should not be held that an ordinance is bad because it says in words just what the law is—that the life of the ordinance and a pursuit of the plan will depend upon a vote of the people.

The case of *Thompson v. Sumner*, 9 Wash. 310, 37 Pac. 450, is relied on. In that case the vote was whether the ordinance should be adopted, in which event the council would call an election upon the plan proposed. Granting that the decision of the court was right, it in no way affects the case at bar, where the election was not postponed and the people, after full notice, voted upon the ultimate question. The ordi-

nance was just as valid before as after the election. The people were not misled. They knew what they were voting on. They did not vote for or against the ordinance, but did vote for or against the acquisition by condemnation of the existing water works. Being ratified, the council passed an ordinance declaring its intention and proceeded to carry out the will of the people.

This brings us to the main questions in the case. We will discuss them separately. First: Has the city followed the plan proposed? Under the act of 1909, the city might have proceeded in either one of two ways. It might have provided for the issuance of general municipal bonds or warrants, or, as it did, for the acquisition of the water works and the creation of a special fund to be sustained by the gross revenues of the water works system and out of which the bonds, with interest, are to be redeemed. The statute is the measure of the city's power in such cases, and the legislature seems to have been careful to provide for the avoidance of any confusion, either upon the part of the council, or the electors affected by the proposed plan. The whole act breathes the spirit of good faith. It says as plainly as a statute can, that if it is the purpose of the council to use any part of the general funds of the city, it shall be so provided. We are bound, therefore, to measure the subsequent conduct of the city by the limit of its power under the statute and as accepted by the council when it passed the preliminary ordinance. We are constrained to hold that the bond issue cannot be sustained under the existing ordinance.

That a city acting under a special statute is bound by the terms of the statute and must submit the plan that it intends to carry out, is too well settled to require any extended citation of authority. It was so held in *Hansard v. Green*, 54 Wash. 161, 103 Pac. 40, 132 Am. St. 1107, 24 L. R. A. (N. S.) 1273, and *Aylmore v. Seattle*, 48 Wash. 42, 92 Pac. 932. This being so, it follows that if the city pursues a plan dif-

ferent from that voted upon, it is exceeding its authority and its act is void.

Coming to the case at bar, after the voters had fixed the amount of the bond issue at "$90,000 as near as may be," which would no doubt have sustained a greater issue, the city, by subsequent ordinance, forced the aid of the general fund by limiting the issue of its special fund bonds to the sum of $90,000. This is $4,500 more, as we shall see, than the purchaser of the bonds is willing to advance upon the security of the water system. This sum is not sufficient to pay the judgment and meet the payment of over $4,000 for expert witness fees and expenses incident to the trial, and the $4,500 which the city has promised to pay the purchasers of the bonds to cover "cost of preparation of bonds, legal expenses, etc.," and the cost of making extensions and necessary repairs. The record discloses the fact that the city is proceeding to pay for these added expenses and commissions out of the general fund of the city. Certainly the law does not contemplate such a thing, for it provides in terms that, where the council pursues the second alternative, that is, to purchase or acquire a water works system and pay for it out of the gross revenues, which are to be retained as a fund for the sole purpose of defraying the cost of the system and "additions, betterments, or extensions thereto;" that "such bonds and warrants and the interest thereon shall be payable only out of such special fund or funds." *Washington-Oregon Corporation v. Chehalis*, 76 Wash. 442, 136 Pac. 681.

The ordinance under which this issue is put forth provides in terms, and the questions put upon the ballot declared the purpose of the city to be, to "Condemn and purchase, purchase, acquire, add to, maintain, conduct and operate." These declarations are comprehensive and include everything incident to the accomplishment of its purpose. The citizens voted a proposition to purchase and maintain without resort to the general fund. They had no opportunity to say whether

they would approve a plan that will admittedly take of the general funds of the city from $10,000 to $15,000.

In the case of *Hansard v. Green, supra,* we held that the manner of payment of the warrants there issued was a vital part of the plan. This, upon the theory that the electors had a right to know whether they would be required to meet the additional burden by direct taxation. In that case we said:

"Payment is as much a part of the 'plan or system' as is the purchase, and a method should be provided in the ordinance."

"The mere adoption of the system or plan would not amount to anything in any case, unless a means of payment went with it; and this is especially so where an expensive plant is to be purchased." *Seymour v. Tacoma,* 6 Wash. 138, 32 Pac. 1077.

In *Aylmore v. Seattle, supra,* we had to deal with a similar situation. We said:

"It is apparent, from a comparison of these several excerpts, that the scheme for creating the fund out of which the bonds were to be paid, as proposed by the ordinance, is not the scheme that was submitted to the voters of the city and by them ratified. The ordinance proposes a fund created by diverting from seventy-five per centum of the gross revenues derived from the existing system sufficient to pay the accruing interest on the bonds until January 1, 1909, and thereafter by diverting from seventy-five per cent of such gross revenues one hundred and seventy-five thousand dollars per annum, exclusive of revenues from water used for municipal purposes. On the other hand, the proposition submitted to the voters was to pay into the fund $175,000 out of the gross revenue of the system without any deductions whatsoever, either of a percentage of the gross revenues derived from the system, or of revenue derived from water used for municipal purposes. This, it seems to us, was not a compliance with the statute in this respect. Inasmuch as the city was required by the statute to submit to the qualified voters of the city the plan for raising revenues to meet the cost of the system, it must submit to them the entire plan, in the form it is proposed to put it into effect, as authority

to incur the obligation in the form proposed is derived as much from the voter as it is from the ordinances and other proceedings on the part of the city officers."

If the manner of payment is an essential part of the plan, and it cannot be doubted under our own decisions and other authorities, it follows that the city cannot, by a subsequent ordinance, change the plan in any of its essentials without a like vote of the people. The power to initiate is in the council, but the authority to act comes from the people in proceedings of this kind, and the voters must say they are willing to finance the proposed system by general taxation. Until they do, the council is without power to pay for any part of the system, or any of the incidental expenses, or for the betterment or extension of the plant out of the general funds.

Second: The next question of importance is whether the council can legally pay the sum of $4,500 to the purchasers of the bonds as a commission to cover "the cost of preparation of the bonds and legal expenses." It is contended by counsel for the city that this is a valid exercise of power under *Yesler v. Seattle*, 1 Wash. 308, 25 Pac. 1014, and *Paine v. Port of Seattle*, 70 Wash. 294, 126 Pac. 628, 127 Pac. 580. We find nothing in these cases that touch the question at bar. We think the payment of the so called commission cannot be sustained upon either one of several grounds. The statute provides that bonds shall draw interest at a rate not exceeding six per cent. In the absence of a controlling statute, it has been generally held that a municipality can sell its bonds below par, and that a sale at par allowing a commission for the sale does not affect the validity of the bonds. But such rules do not pertain where the law provides that bonds shall not be sold at less than par.

"The purpose of such prohibitive provisions is clear and the reasons sound. Contracts for the sale of securities at less than par when this is prohibited are usually held void." Abbott, Public Securities, § 245.

This is the logic of the court's holding in the case of *Paine v. Port of Seattle, supra.*

Turning, then, to the statute governing the present issue, we find that the council is required to issue and sell bonds or warrants, in payment for the public utility, "bearing interest at a rate not exceeding six per centum per annum." This limitation on the power of the council is just as prohibitive, and if disobeyed would result in the same evil, as if the statute had provided that the bonds should not be sold for less than par. In either case the object of the law is to prevent speculation in municipal securities, and to insure to those who must ultimately pay the bonds, a dollar in lawful currency for every dollar of obligations issued. Any device to defeat these purposes, when declared by statute, has been invariably frowned upon.

In *Hunt v. Fawcett,* 8 Wash. 396, 36 Pac. 318, the court having under consideration a statute providing that bonds should not be sold at less than par, said:

"While the contemplated sale in this case is nominally a sale at par, it is in fact a sale at a discount and, therefore, within the inhibition of the statute.

"To sell bonds at their face value and at the same time pay a large commission to the purchaser is not to sell at par."

And by the same reasoning, to issue bonds of the face value of $90,000 and pay to the purchaser the sum of $4,500 out of the general fund, under the pretense of meeting the incidental expenses of the issue, is plainly a device to pay a greater sum for the use of the money loaned than the statute will permit. Where the mode of sale and delivery is fixed by the law confirming authority to issue bonds, public officials are generally required to make negotiations and effect a sale without the intervention of a financial agent or other representative of the corporation to whom, under a contract of employment, compensation is usually made in the form of a commission. Abbott, Public Securities, § 247.

In the *Appeal of Whelen*, 108 Pa. St. 162, 1 Atl. 88, a commission had been allowed the purchaser. The statute provided that the bonds should be sold at not less than par. The court held the commission to be a discount, saying:

"A man cannot negotiate with himself. The contract is an unequivocal, absolute sale of the bonds to the syndicate at a discount of one per cent. below par—that one per cent. is attempted to be concealed under the thin disguise and sham of a commission. The moment the syndicate became purchasers, they ceased to be agents. If they are agents, entitled to commission, the city is entitled to the benefit of whatever they may sell the bonds for above par. It is difficult to argue a proposition which, to our minds, is so nearly self-evident."

There is another reason for holding the transaction illegal. It is usurious. A statute fixing a maximum rate of interest may not be evaded at will by any device or contrivance which will insure a greater return of interest than the law allows. This court has been extremely liberal in its holdings in cases involving the question of usury. We have put the burden upon the one alleging usury (*Washington Fire Ins. Co. v. Maple Valley Lumber Co.*, 77 Wash. 686, 138 Pac. 553); and we have held that a fee paid to an agent for services rendered in preparing papers, searching records, etc., where the fee was reasonable and not disproportionate to the services rendered, and not paid as a commission, was not a taking of an illegal interest. *Testera v. Richardson*, 77 Wash. 377, 137 Pac. 998. But we have steadfastly held that any device, however specious, to defeat the law will not be tolerated, and this, too, whether it is made the subject of proof or is apparent from the admitted facts. *Dale v. Duryea*, 49 Wash. 644, 96 Pac. 223; *Inland Trading Co. v. Edgecombe*, 57 Wash. 257, 106 Pac. 768.

In this case it is admitted that the payment of the $4,500 is a commission for a pretended service, "preparation of the bonds, legal services, etc.," but as said in the *Edgecombe* case, "we will not overlook the fact that the value of the

services of the respondent in procuring the contract was inconsiderable. Practically the only service he could have rendered was to prepare the applications on blank forms, furnished by the state." So in this case, we will not overlook the fact that it is the duty of the city attorney to prepare the bonds, and of the city to print them at a cost which it is the duty of the council to find is a reasonable cost, and were it otherwise, the sum paid is grossly disproportionate to the cost of preparation. With respect to legal expenses to the buyer and the city, the expenses should be no more than the cost of filing a complaint and demurrer, entering a judgment, and printing briefs and taking the opinion of this court, which is final and is rendered without any direct charge to the city.

But if these reasons be insufficient, it still remains that the payment made cannot be sustained. If it were lawful to pay a commission, or, to put it, as the city attorney puts it, to pay for the cost of preparing and printing the bonds, the commission could not be paid out of the general fund. It, as well as the cost of expert opinion witnesses, is incidental to the acquisition of the water plant and is chargeable to and "payable only out of such special fund or funds." Laws of 1909, p. 584, § 4 (Rem. & Bal. Code, § 8008).

The suggestion that the payment out of the general fund is in the nature of an advance or loan, to be paid back out of the revenues, has no sustaining reason, either in law or in fact. The special fund and the acquisition of a water works under the plan adopted by the electors is a thing entirely separate from the general funds of the city. The legislature has not provided, neither has it given authority to the council, to treat the general fund as a banking fund to be loaned, as it were, to an independent enterprise, to be repaid upon the happening of a contingency. Nor could the council repay its voluntary loan out of the earnings of the water plant if its right to do so were questioned. Under the ordinance and probably under the statute, the earnings or revenues are a

pledge in gross to meet the bonds. If the revenues were insufficient to meet the one or the other, the payment of the bonds might be compelled, to the ultimate loss or impoverishment of the general fund.

The legislature has been most free in its grants of power to cities and this court has been liberal in its constructions. The statute is plain and, if followed, will avoid all confusion. Neither the council nor this court can go beyond its terms under the assumption that no harm will come in the end if the statute is ignored.

In *Aylmore v. Seattle, supra,* in meeting a similar contention, we said:

"We have not overlooked the argument that the voter is not injured if the city grants less than the vote authorizes, but we think that argument is not sound. The injury lies in the fact that such defects and irregularities frighten away the prudent, cautious person who is seeking a safe and permanent investment, and who would be inclined to take the bonds on low rates—leaving the field entirely to those of speculative turn who are willing to take increased risks for the sake of increased gains. Both the city and the voter are injured when the proceedings leading up to the issuance of the bonds are so defective as to give rise to these conditions."

And in *Hunt v. Fawcett, supra:*

"It is argued, however, by the learned counsel for the respondents that, inasmuch as the county might have issued seven instead of five per cent. bonds, and inasmuch as the bonds as sold do not cost the county a greater rate of interest than seven per cent. on the amount realized, the sale is really not below par. But the argument may be sufficiently answered by saying that the validity of the contract must depend upon its terms and not upon its ultimate effect upon the county."

Stronger reasons suggest themselves in this case. The payments or loans, whatever they may be called, are a present charge upon the general fund and a possible future charge, and will presently, if they have not already, put the city beyond its constitutional debt limit. Furthermore, the

statute will not bear the construction that the city can purchase by condemnation a water works system under the special fund plan and use it as a money making venture. The object of municipal ownership is to give the citizen the best possible service at the lowest possible price. Under the ordinance, the citizen who is taxed to the extent of his use of the utility is entitled to all benefits. When the plant is maintained, the interest paid and a sinking fund is provided to retire the bonds, the taxpayer—the water user—who is primarily burdened with the task of meeting the maintenance, betterments, interest and costs of the system, is entitled to the benefit. If these things are not true, there can be no virtue in public ownership, and the object of the city as revealed by its preliminary ordinance would not be accomplished.

Third: It is also contended that the city cannot provide for the payment of a fair rate for rentals for the water used by it as a municipality. This upon the theory that the city cannot purchase from itself.

This argument is not sound. If a water plant, acquired as it is proposed to acquire this one, is a separate thing and the debt incurred is not a general debt, the city is not, save in the most technical sense, purchasing from itself. The city, in meeting functions that are called governmental, is taking from the city as a proprietor a thing held in its proprietary capacity, therefore the general fund of the city may be charged and the special fund credited with a reasonable charge for the water used when it is so provided in the ordinance. The city, as a governmental entity, stands in the same relation to the system as a private citizen who is patronizing it.

Other questions are raised. They do not go to the legality of the bond issue. They raise only potential issues, or they are not important in the light of our conclusions upon the general issues.

Reversed, and remanded with instructions to overrule the demurrer.

MORRIS, C. J., HOLCOMB, PARKER, and MOUNT, JJ., concur.

## ON REHEARING *En Banc*.

[Decided November 17, 1915.]

CHADWICK, J.—A petition for rehearing has been filed in this case, in which the court is informed that the city council of Olympia has, since the original decision was pronounced, repealed ordinance No. 1,372, which limited the bond issue to $90,000.

It is contended that, under that part of the decision wherein the court said: "Coming to the case at bar, after the voters had fixed the amount of the bond issue at '$90,000 as near as may be' *which would no doubt have sustained a greater issue*, the city, by subsequent ordinance, forced the aid of the general fund by limiting the issue of its special fund bonds to the sum of $90,000," the city, having repealed the limitation, has power to issue bonds to the extent of $10,-000 in excess of the $90,000 or such sum as may be necessary to cover the items referred to in the original opinion barring the amount agreed to be paid as a commission and for the printing of the bonds.

Reliance is put upon the words, *"which would no doubt have sustained a greater issue."* After mature consideration, it is the opinion of the judges, including the writer of the original opinion, that these words were inadvertently used, and that the contention of the city cannot be sustained under the statute and the general rules of law, which have been sufficiently referred to in the opinion of the court, or under the ordinance providing for the purchase of the waterworks system.

It was the understanding of the court that an issue of bonds for some inconsequential sum above the limit of $90,-

000 might be sustained. That is, that the purpose of the statute was to compel a reasonably definite estimate of the value of the thing to be purchased beyond which the council could not go, unless to cover slight omissions which, upon consideration, a court might ignore under the maxim: *"De minimus non curat lex."*

But to hold that a sum equal to ten per cent of the whole issue would be a sufficient compliance would be holding in effect that there might be no limit at all. If the court should assume to define the limit of increase, it could find no reasonable or definite ground upon which to base its judgment. Could it say that an increase of ten per cent was within the intent of the people when voting upon the measure, and that fifteen per cent was an increase so substantial that we could judicially determine that the people did not intend to grant the power? It will thus be seen that the amount of the bond issue is, and must of necessity be, a matter entirely within the keeping and subject to the judgment of the taxpayers and citizens of the community exercising the powers conferred by the statute, and with which the courts can have nothing whatever to do without usurping a legislative function which, under the statute, is lodged neither in the courts nor in the city council, but in the people themselves.

Reliance is put upon that part of the ordinance under which the people were invited to declare their purpose which reads as follows: "The issuance of bonds as provided for herein is based upon the estimated cost of $90,000 as near as may be, and in the event that a larger sum is necessary to carry out the purposes of this ordinance, the issuance of bonds in the total amount necessary shall be provided for by supplemental ordinance to be enacted after the actual amount of bonds necessary to carry out the purpose of this ordinance is ascertained." It will be seen that this section of the ordinance violates the spirit and intent of the act giving the council power to pass an ordinance providing for the submission of such questions.

The council had fixed, as the estimated sum necessary to purchase the waterworks, $90,000. It could not, therefore, make its own act indefinite by providing, in the event a larger sum became necessary after the condemnation to carry out the purpose intended, that it might provide by supplemental ordinance for the issuance of bonds in the total amount necessary, whatever that sum might be. If the council could do this, it could make out of the statute a mere form and leave the citizen as uninformed as to the probable amount of the bond issue as if no sum had been fixed as an estimate at all. It could fix an estimate at, say, $25,000, without reference to probable values, and issue bonds at will and to any amount. In other words, under the authorities cited in our former opinion, holding that the payment and the manner of payment are just as much a part of the plan as the declaration of intent, and under the statute which provides that there shall be reasonable certainty in declaring the amount of the estimate, it follows that the council cannot, by resort to supplemental ordinance, substantially increase the burden as it is fixed by the estimate.

We are asked to pass, in a tentative way, upon several questions. Inasmuch as we have decided to adhere to the original opinion, which will call for future action upon the part of the city council if it sees fit to pursue its intention, all questions that might embarrass any future proceeding may be obviated.

Petition denied.

MORRIS, C. J., PARKER, HOLCOMB, ELLIS, FULLERTON, MOUNT, and MAIN, JJ., concur.