100 P.3d 310 (2004)
DES MOINES MARINA ASSOCIATION, A Washington non-profit corporation; Thomas Sitterley; Larry Shrout, and Ken Gindroz, Respondents/Cross-Appellants,
v.
CITY OF DES MOINES, a municipal corporation, Appellant/Cross-Respondent.
No. 52757-6-I.
Court of Appeals of Washington, Division 1.
September 27, 2004.
Publication Ordered October 25, 2004.
Reconsideration Denied October 28, 2004.
*312 Stewart Andrew Estes, Kimberly Joy Waldbaum, Keating Bucklin & McCormack, Seattle, WA, for Appellant.
Eric Rolf Stahlfeld, Attorney at Law, Seattle, WA, for Respondent.
SCHINDLER, J.
The Des Moines Marina Association (the Association), Association president Thomas Sitterley, and marina tenants Ken Gindroz, and Larry Shrout sued the City of Des Moines (the City) for adopting an ordinance to increase moorage rates at the city-owned marina. The Association, Sitterley, Gindroz and Shrout claimed that the City did not have authority to charge more than it cost to operate and maintain the marina, that charging nonresidents higher rates violated the equal protection clause of the United States Constitution, and that the City violated the equal protection provision of the Washington State Constitution, art. I, § 12. The City appeals the trial court's decision that ordinance 1250 violated the federal equal protection clause. The Association challenges the trial court's decision that it did not have standing to sue. The Association, Sitterley, Gindroz and Shrout appeal the trial court's decision that the City had authority to increase moorage rates and did not violate art. I, § 12. We affirm the trial court's dismissal on summary judgment of the Association for lack of standing, its decision that the City had authority to increase rates for moorage in its marina, and its dismissal of the art. I, § 12 claim. We reverse the trial court's decision that charging nonresidents a higher moorage rate violated the equal protection clause of the federal constitution.

FACTS
The City operates the Des Moines Marina (the marina) and leases moorage to recreational boaters. Of the marina's 830 slips, approximately 230 are leased by City residents and 600 by nonresidents. In addition to the moorage rates charged by the City, state law has required all marina tenants to pay a leasehold excise tax since 1976.
As a result of a Washington State initiative in 1999, the City anticipated a loss of approximately twenty percent of its revenue. As part of its strategy to address the revenue loss, the City decided to raise moorage rates for all tenants at the City's public marina and adopted ordinance 1250. Ordinance 1250 also imposes slightly higher moorage rates for nonresident marina tenants. The rates *313 for nonresident tenants were zero to twelve percent higher than those for resident tenants, depending on slip length.[1]
The Association, Association president Thomas Sitterley, and nonresident marina tenants Larry Shrout and Ken Gindroz filed a lawsuit against the City alleging the rate increase was an unconstitutional property tax under art. VII of the Washington State Constitution, the City lacked authority to adopt ordinance 1250 because it impermissibly raised moorage rates above what was necessary to operate the marina and the higher rates for nonresidents violated the equal protection clause of the Fourteenth Amendment to the United States Constitution.[2]
The City filed a summary judgment motion to dismiss. The City's motion was granted in part and denied in part. The trial court granted the City's motion to dismiss the claims that the City violated art. VII of the Washington State Constitution and that the City lacked authority to adopt ordinance 1250.[3] The trial court also ruled the Association did not have standing to sue on behalf of its members.[4] The court denied the City's motion to dismiss Gindroz and Shrout's claim that charging higher moorage rates for nonresidents violated the federal equal protection clause.
At trial, the parties stipulated to facts on Gindroz and Shrout's federal equal protection claim. At the beginning of trial, the court suggested Gindroz and Shrout should also consider a claim under the state equal protection clause, art. I, § 12 of the Washington State Constitution.[5] Over the City's objection, the court granted Ginrdoz and Shrout's request to amend their complaint to allege violation of art. I, § 12.
On the claim that charging nonresidents more for moorage violated the federal equal protection clause, the trial court ruled there was a rational basis for the City to charge different rates for residents and nonresidents, but concluded that because the state leasehold excise tax (LET) statute, RCW 82.29A.010, required all marina tenants to pay a LET, the City could not charge more for nonresidents than for residents. After post-trial briefing, the trial court dismissed Gindroz and Shrout's art. I, § 12 claim. The trial court awarded damages to Gindroz and Shrout and entered a judgment in their favor on the federal equal protection claim.[6]
The City appeals the trial court's decision that ordinance 1250 violated the federal equal protection clause and its entry of judgment for Gindroz and Shrout. The Association appeals the trial court's decision that it did not have standing. The Association, Sitterley, Shrout and Gindroz appeal summary judgment dismissal of their claims that the City did not have authority to adopt ordinance 1250 and did not violate art. I, § 12 of the Washington State Constitution.

ANALYSIS

Federal Equal Protection
The City argues the trial court erred when it ruled the state's LET eliminates the City's otherwise rational basis for setting slightly higher moorage rates for non-residents under the federal equal protection clause.[7] We review a trial court's conclusions *314 on a constitutional issue de novo. Shoop v. Kittitas County, 149 Wash.2d 29, 33, 65 P.3d 1194 (2003).
An ordinance is presumed constitutional and the party challenging the classification has the heavy burden of overcoming this presumption. Convention Center Coalition v. City of Seattle, 107 Wash.2d 370, 378, 730 P.2d 636 (1986); see also Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).
The legislature has broad discretion in establishing classifications in social and economic legislation. A classification will be upheld if any state of facts may reasonably be conceived to substantiate it. Such a rational basis for a legislative decision need not have actually motivated the Legislatures decision. (Footnotes omitted)
Ford Motor Co. v. Barrett, 115 Wash.2d 556, 565, 800 P.2d 367 (1990) (quoting Haberman v. Washington Public Power Supply System, 109 Wash.2d 107, 140, 744 P.2d 1032, 750 P.2d 254 (1987)).
The first step in an equal protection analysis is to determine the appropriate standard of judicial review. Id. Here, the parties agree that the rational basis test is the appropriate standard.[8] For the rational basis test, a court must determine whether (1) all members of the class created within the statute are treated alike; (2) reasonable grounds exist to justify the exclusion of parties who are not within the class; and (3) the classification created by the statute bears a rational relationship to the legitimate purpose of the statute. DeYoung v. Providence Med. Ctr., 136 Wash.2d 136, 144, 960 P.2d 919 (1998). Under the rational basis test, the law must be rationally related to a legitimate state interest and will be upheld unless the classification rests on grounds wholly irrelevant to the achievement of a legitimate state objective. Id.
Below, the City argued that Ordinance 1250 did not violate equal protection for two reasons. First, City residents pay taxes for police and fire service, and road maintenance that non-residents do not pay. Second, most of the tenants at the marina are nonresidents and the City was trying to encourage more residents to use the marina. Nonresident marina tenants Gindroz and Shrout did not dispute these reasons met the rational basis test but argued that because all marina tenants pay the LET, it is a violation of equal protection to charge nonresidents higher moorage rates than residents.
The trial court concluded the City's justifications were a rational basis for the difference in rates charged for resident and nonresident tenants. "Des Moines residents pay taxes which pay for police and fire service, and road maintenance. Non-residents do not.'"[9] But the court agreed with Gindroz *315 and Shrout's argument and concluded that because of the LET, the City cannot adopt and charge higher rates for nonresidents. We disagree with this conclusion.
The LET imposes an excise tax on all leases of publicly owned property. When the Washington State Legislature enacted the LET in 1976, it recognized that while publicly owned property was exempt from property taxes,[10] private lessees of public properties received substantial benefits from government services. RCW 82.29A.010(1). RCW 82.29A.010(1)(c) states:
The legislature finds that lessees of publicly owned property are entitled to those same governmental services and does hereby provide for a leasehold excise tax to fairly compensate governmental units for services rendered to such lessees of publicly owned property.
Gindroz and Shrout's premise that the LET fully compensates the City for services such as police and fire protection and road maintenance is flawed. The LET requires a 12 percent state tax on all rent collected for leases of publicly owned property and authorizes cities and counties to impose a four to six percent LET as part of the 12 percent LET. RCW 82.29A.030(1), .040.[11] The imposition of the LET was justified as an effort to compensate municipalities for the services to lessees of publicly owned property. Although cities may levy a four percent tax and share in the LET proceeds, the statute does not allow cities the flexibility to increase the LET tax rate to fully compensate for the services they provide to all lessees of publicly owned land, including nonresidents who do not otherwise pay for services. The 12 percent LET for all moorage tenants at the City's marina has included a city tax since 1976. The 12 percent LET rate has not changed since it was set by the legislature in 1976.
The statute does not purport to fully compensate a government unit for all costs of services to lessees of publicly owned property. And because the LET is paid by both residents and nonresidents, the LET does not provide a basis to differentiate between the two for purposes of the amount paid for city services.
We conclude the LET does not undermine the rational basis that justifies the City's decision to charge nonresidents higher moorage rates at the marina and the trial court erred when it held the City violated the federal equal protection clause.

The Association's Standing
The Marina Association argues the trial court erred in concluding it did not have standing and dismissing the Association's claims on summary judgment.
When reviewing a trial court's decision to grant summary judgment this court engages in the same inquiry as the trial court. Reynolds v. Hicks, 134 Wash.2d 491, 495, 951 P.2d 761 (1998). Summary judgment is properly granted when the pleadings and affidavits show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). All facts and reasonable inferences are considered in a light most favorable to the nonmoving party. Huff v. Budbill, 141 Wash.2d 1, 7, 1 P.3d 1138 (2000).
The Association has the burden of establishing that it has standing to sue on behalf of its members. See, e.g., Save a Valuable Environment (SAVE) v. City of Bothell, 89 Wash.2d 862, 866-67, 576 P.2d 401 (1978); Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). The Association must meet all three of the following elements to have standing:
(1) the members of the organization would otherwise have standing to sue in their own right;
(2) the interests that the organization seeks to protect are germane to its purpose; and

*316 (3) neither claim asserted nor relief requested requires the participation of the organization's individual members.
International Ass'n of Firefighters, Local 1789 v. Spokane Airports, 146 Wash.2d 207, 213-14, 45 P.3d 186 (2002).
The Association argues it has standing because the City agreed that nonresident marina tenants Shrout and Gindroz have standing. But there is no evidence in the record that either Gindroz or Shrout is a member of the Association, or that any of the Association's 180 members are nonresidents. According to the complaint, the Association is a non-profit corporation whose members own boats and lease moorage at the City's marina. The complaint only identifies Sitterley as a member of the Association. Sitterley is the president of the Association and a City resident who leases moorage at the marina. The complaint identifies Shrout and Gindroz as nonresidents who lease moorage at the marina, but does not allege that they are Association members. Although the City in interrogatories asked the Association to identify its nonresident members and their damages, the Association did not do so.[12] Based on the record, the only identified Association member is Sitterley, who is a City resident.
We conclude there is no evidence that any Association members were nonresidents. The Association was properly dismissed under International Ass'n of Firefighters.

City's Authority
The Association, Sitterley, Shrout and Gindroz claim the trial court erred when it ruled as a matter of law that the City had the authority to increase the moorage rates for marina tenants.[13] They contend there is no statute authorizing the City to operate the marina as a business and transfer its profits to the City's general fund. We disagree.
The City of Des Moines is a non-charter, Optional Municipal Code city governed by Title 35A, Revised Code of Washington. The stated purpose of Title 35A RCW is to grant "the broadest powers of local self-government consistent with the Constitution of this state." RCW 35A.01.010.[14] RCW 35A.11.020 grants code cities "all powers possible for a city or town to have under the Constitution of this state, and not specifically denied to code cities by law."
Cities governed under the optional municipal code can lease real and personal property, including waterways, structures and improvements. RCW 35A.11.010, .020. Optional municipal code cities have all powers granted by general laws to cities and towns of any class relative to docks and harbors including, but not limited to, the provisions of RCW 35.22.280 and RCW 35.23.440.[15] *317 RCW 35A.88 .020. RCW 35.22.280 and RCW 35.23.440 allow the City to set rates for the use of its marina.[16] Neither statute limits the City's authority to increase moorage rates for marina tenants.
The Association and marina tenants rely on Uhler v. City of Olympia, 87 Wash. 1, 14-15, 151 P. 117 (1915), and State ex rel. Port of Seattle v. Superior Court, 93 Wash. 267, 160 P. 755 (1916), to argue that the City cannot generate a profit or transfer marina proceeds to the City's general fund.[17]Uhler and Port of Seattle are distinguishable. Uhler is a 1915 case that predates the enactment of the optional municipal code by more than 50 years. In Uhler, the Court held the statute that authorized the City of Olympia to issue bonds to acquire a water utility and use the revenue to redeem the bonds expressly prohibited the City from using the utility to generate a profit. The Association and tenants have not pointed to an analogous provision that similarly limits the City's authority. And Port of Seattle does not limit a city's authority to transfer funds generated by leasing city property to a city's general fund. In Port of Seattle, the Court held that the board of port commissioners was not authorized to expend public tax funds to defeat proposed legislation affecting the port's authority.
We conclude the City is authorized to charge moorage fees in excess of the marina's operation costs and to transfer proceeds from the marina to the City's general fund.[18]

Article I, section 12 of the Washington State Constitution
Shrout and Gindroz claim the trial court erred when it dismissed their equal protection claim under art. I, § 12 of the Washington State Constitution.[19]
Art. I, 12 provides: "No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations."
Gindroz and Shrout rely on Grant County Fire Protection District No. 5 v. City of Moses Lake, 150 Wash.2d 791, 83 P.3d 419 (2004) (Grant County II), to argue that art. I, § 12 provides greater protection than the Equal Protection Clause of the United States Constitution.
In Grant County Fire Protection District No. 5 v. City of Moses Lake, 150 Wash.2d 791, 83 P.3d 419 (2004) (Grant County II), the Court considered whether the petition method of annexation affords an impermissible privilege to owners of highly *318 valued land such that it violates art. I, § 12. After analyzing art. I, § 12 in light of the six Gunwall factors,[20] the Court concluded that art. I, § 12 requires an independent constitutional analysis from the equal protection clause of the United States Constitution. The Court then analyzed whether art. I, § 12 had been violated under the facts in that case. The Court concluded there was no constitutional violation because the legislature has plenary power to adjust the boundaries of municipal corporations and thus citizens of the state do not have a fundamental right to seek or prevent annexation.
Gindroz and Shrout contend that because Grant County II held that art. I, § 12 requires an analysis separate and independent from the federal equal protection clause, and because the state constitution cannot be less restrictive than the federal constitution, the state equal protection clause must provide greater protection. But even if we assume that a separate and independent analysis of art. I, § 12 is required under Gunwall, Gindroz and Shrout present no argument regarding how a separate analysis of art. I, § 12 supports their claim of a constitutional violation. A determination that a provision of the Washington State Constitution requires a separate analysis is only the first part of analyzing a claim based on the State Constitution. After a court decides a separate analysis is appropriate, the court must do the separate analysis to determine whether a violation of the State Constitution occurred. See, e.g., Grant County II; Malyon v. Pierce County, 131 Wash.2d 779, 798, 935 P.2d 1272 (1997). Gindroz and Shrout provide no analysis of the Washington Constitution or common law history addressing the issue here, namely, whether residents of a city may be treated differently than nonresidents, and they present no argument regarding how art. I, § 12 was violated in this case. We therefore conclude that the trial court's dismissal of Gindroz and Shrout's claim under art. I, § 12 was not error.[21]

Conclusion
We affirm the trial court's decision to dismiss the Association for lack of standing, its decision that the City had authority to charge market rates for moorage in its marina, and decision to dismiss the art. I, § 12 claim. We reverse the trial court's decision that charging nonresidents a higher moorage rate than residents violated the federal equal protection clause and vacate the judgment entered in favor of Gindroz and Shrout.
COLEMAN and ELLINGTON, JJ., concur.
NOTES
[1] For example, while the rate per foot for a 20 or 24 foot moorage berth was the same for residents and nonresidents, the rate for a covered 40 foot berth was $7.48 per foot for residents and $8.37 per foot for nonresidents.
[2] The complaint also asserted a class action claim, a takings claim, a 42 U.S.C. § 1983 claim and a claim that the City violated its own ordinances.
[3] The court also dismissed the plaintiffs' class action claim, their takings claim, their 42 U.S.C. § 1983 claim and their claim that the City violated its own ordinances.
[4] While marina tenants Sitterley, Shrout and Gindroz remained parties to the suit, only nonresidents Shrout and Gindroz could pursue equal protection claims.
[5] Art. I, 12 provides: "No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations."
[6] The court awarded $507.98 to Gindroz and $928.88 to Shrout.
[7] The Fourteenth Amendment to the United States Constitution provides: "No State shall make or enforce any law which shall ... deny to any person within its jurisdiction the equal protection of the laws."
[8] When analyzing a statute or rule which does not affect fundamental rights or create a suspect classification, this court applies the rational basis test. Id.
[9] CP at 261. The court's ruling that ordinance 1250 did not violate equal protection by charging nonresidents higher moorage rates than residents is supported by case law. See, e.g., Baldwin v. Fish and Game Commission of Montana, 436 U.S. 371, 98 S.Ct. 1852, 56 L.Ed.2d 354 (1978) (A Montana statute that charged non-resident hunters higher licensing fees than resident hunters did not violate the Equal Protection clause because the statutory justification that resident hunters had already contributed to wildlife goals through the payment of taxes was rational and therefore passed constitutional muster. The Court upheld the statute despite the fact that the difference in fees did not precisely account for the difference in cost to the state.); Hawaii Boating Ass'n v. Water Transport Facilities, 651 F.2d 661 (9th Cir.1981) (A Hawaii statute that imposed higher moorage fees for non-residents than residents withstood an equal protection challenge because it was supported by a rational basis, i.e., equalizing costs attendant to maintaining and constructing small boat harbors. The court noted, "[r]esidents have recently contributed to the state's economy through employment and state taxes, while non-residents have not." Id. at 666.); Barber v. State of Hawaii, 42 F.3d 1185, 1196 (9th Cir.1994) (following Hawaii Boating Ass'n); and Broeckl v. Chicago Park District, 131 Ill.2d 79, 136 Ill.Dec. 106, 544 N.E.2d 792 (1989) (Chicago Park District system in which non-resident boaters were charged a higher fee than residents and where the District was alleged to make significant profit on moorage fees did not violate equal protection); see also 5 McQuillin, Municipal Corporations, § 19.25 (3rd Ed.1996) ("[A] differentiation between residents and nonresidents with respect to fees for use of recreational facilities, if reasonable, will not render the ordinance invalid.").
[10] See art. VII, § 1 of the Washington State Constitution.
[11] The full amount of the LET is collected by the State Department of Revenue and any credited amounts are then returned to the city or county to which they are due. RCW 82.29A.040.
[12] In response to the City's interrogatories, the Association only stated that: "Each non-resident who is a member of the Des Moines Marina Association is represented by the Association and seeks a refund of the higher amount paid." CP at 584.
[13] This court reviews questions of law de novo. Wash. Equip. Mfg. Co. v. Concrete Placing Co., 85 Wash.App. 240, 244, 931 P.2d 170 (1997).
[14] The statute also provides:

Any specific enumeration of municipal powers contained in this title or in any other general law shall not be construed in any way to limit the general description of power contained in this title, and any such specifically enumerated powers shall be construed as in addition and supplementary to the powers conferred in general terms by this title. All grants of municipal power to municipalities electing to be governed under the provisions of this title, whether the grant is in specific terms or in general terms, shall be liberally construed in favor of the municipality.
RCW 35A.01.010 (emphases added).
[15] RCW 35.22.280 provides that any first class city has the power:

(25) To deepen, widen, dock, cover, wall, alter, or change the channels of waterways and courses, and to provide for the construction and maintenance of all such works as may be required for the accommodation of commerce, including canals, slips, public landing places, wharves, docks, and levees, and to control and regulate the use thereof;
(26) To control, regulate, or prohibit the anchorage, moorage, and landing of all watercrafts and their cargoes within the jurisdiction of the corporation;
(27) To fix the rates of wharfage and dockage, and to provide for the collection thereof, and to provide for the imposition and collection of such harbor fees as may be consistent with the laws of the United States;
RCW 35.23.440(26) gives second class cities the power and authority:
Harbors and wharves: To build, alter, improve, keep in repair, and control the water-front; to erect, regulate, and repair wharves, and to fix the rate of wharfage and transit of wharf, and levy dues upon vessels and commodities; and to provide for the regulation of berths, landing, stationing, and removing steamboats, sail vessels, rafts, barges, and all other watercraft.
[16] The Illinois Supreme Court in Broeckl, 131 Ill.2d 79, 136 Ill.Dec. 106, 544 N.E.2d 792, addressed a statute similar to RCW 35.22.280 and RCW 35.23.440 that authorized a Park District to set and collect fees and did not limit the amount of fees. The court in Broeckl concluded the Park District was authorized to charge moorage fees in excess of the costs actually incurred by the moorage.
[17] The Association, Sitterley, Shrout and Gindroz also rely on Tacoma Gas & Electric Light Co. v. City of Tacoma, 14 Wash. 288, 291, 44 P. 655 (1896), and Kightlinger v. Public Utility Dist. No. 1 of Clark County, 119 Wash.App. 501, 81 P.3d 876 (2003), to argue that a delegation of powers to a municipal corporation must be conferred by express statutory enactment and will not be presumed in favor of a municipal corporation unless those powers are necessary to its corporate existence. But neither of these cases addresses the powers of optional municipal code cities like the City of Des Moines, and the Association, Sitterley, Shrout and Gindroz do not acknowledge the broad grant of power contained in Title 35A RCW.
[18] The Association, Sitterley, Shrout and Gindroz argue that revenue generated in excess of the operating expenses of the marina are not authorized user fees but are instead unauthorized taxes. The trial court dismissed the claim that moorage rates set by Ordinance 1250 imposed an unconstitutional tax. This claim is not included in an assignment of error and is not considered on appeal. RAP 10.3(a)(3).
[19] Although all four respondents (the Association, Sitterley, Gindroz and Shrout) appear to raise this issue together in Respondents'/Cross-Appellants' Brief, Gindroz and Shrout were the only plaintiffs remaining in the case when this claim was added at trial.
[20] State v. Gunwall, 106 Wash.2d 54, 720 P.2d 808 (1986). Under Gunwall, when determining whether our state constitution requires a separate and independent constitutional analysis from the United States Constitution our courts consider six nonexclusive neutral criteria: (1) the textual language of the state constitution; (2) differences in the texts of parallel provisions of the federal and state constitutions; (3) state constitutional and common law history; (4) preexisting state law; (5) structural differences between the federal and state constitutions; and (6) matters of particular state or local concern. Gunwall, 106 Wash.2d at 58, 720 P.2d 808.
[21] Because we conclude the trial court did not err when it dismissed Gindroz and Shrout's claim under art. I, § 12, we need not address the City's alternative arguments that there is no private right of action for money damages for a violation of the Washington State Constitution absent some "augmenting legislation" and that Gindroz and Shrout failed to adequately plead a claim for injunctive relief.