[29883.  *En Banc.*  March  10,  1947.]

WALTER L. COTTEN, *Appellant,* v. M. G. WILSON *et al.,*
*Respondents.*[1]

[1]Reported in 178 P. (2d) 287.

Lloyd B. Dysart and J. O. Davies, for appellant.

Peterson & Duncan and C. D. Cunningham, for respondents.

ABEL, J.—Respondent Wilson (who will hereafter be referred to as though he is the sole respondent) was the owner of a victory motor vehicle capable of carrying more than six seated passengers, exclusive of the driver, which had been licensed under the victory motor vehicle act (Laws of 1943, chapter 281, p. 885; Rem. Supp. 1943, § 6397-30 [P.P.C. § 746w-15] et seq.), and which was used by him to transport persons who were engaged in war defense work. Respondent London Guarantee and Accident Company, Limited, was the insurer on the liability bond filed by respondent Wilson with the director of licenses of the state of Washington for the protection of passengers, as required by § 10 of the act referred to. Appellant Cotten was an employee of the Seattle-Tacoma Shipbuilding Company, working at Tacoma and living in Centralia.

On the day of the accident under inquiry, appellant was a passenger in respondent's victory motor vehicle, en route from Tacoma to Centralia. He brought this action to recover damages for personal injuries alleged to have been sustained by him as the result of the bus running off the pavement into a stream, which crossed under the highway, following a blowout of the right front tire and, specifically, because of the lack of a proper braking mechanism sufficient to stop the bus in the emergency presented when the tire puncture was sustained.

The trial judge granted respondent's motion for dismissal at the close of appellant's evidence, and discharged the jury which had been impaneled to try the action. He predicated his ruling (1) upon the provision of § 11 of the victory motor vehicle act which requires proof of gross negligence of the owner or operator of a victory vehicle, of the carry-

ing capacity of the one under consideration, before recovery of damages may be had by an injured passenger; and (2) upon the failure of appellant's evidence to make a *prima facie* factual showing of gross negligence sufficient, in law, to warrant consideration of the case by the jury.

The pertinent parts of the victory motor vehicle act are: Section 1 (Rem. Supp. 1943, § 6397-30), as follows:

"By reason of the war in which the United States is engaged and the establishment and operation of many large and important plants in this state devoted to the manufacture and construction of essential war materials, and the large number of workmen employed in said plants, and by reason of the national program of conservation of motor vehicles, equipment, fuel and tires, an emergency exists in the transportation of said workmen from their homes to said plants. Established transportation agencies are carrying said workmen to the limits of their capacities and it has become necessary for said workmen to travel to and from their work in groups in private passenger cars and other motor vehicles of all types. The operation of said motor vehicles unregulated has created unsafe and hazardous conditions upon the public highways and makes it imperative that more complete regulation should be employed as to such transportation to the end that the highways may be rendered safer for the use of the general public, and that safe conditions in such transportation may be fostered in the public interest. It is hereby found and declared to be necessary in the public interest that regulation of such transportation be effected."

Section 2 (Rem. Supp. 1943, § 6397-31 [P.P.C. § 746w-17]), which defines a victory motor vehicle, as follows:

"(j) . . . Any motor vehicle built for or capable of carrying seated more than six (6) passengers, exclusive of the driver, used exclusively for the purpose of carrying for compensation, *employees of defense plants* to and from said defense plants. 'Victory Motor Vehicle' as herein defined shall not be included within the terms 'auto stage' and 'for hire vehicle' as said terms are defined in section 1, chapter 188, Laws of 1937, or any amendment thereto." (Italics ours.)

Section 11 (Rem. Supp. 1943, § 6397-40 [P.P.C. § 746w-17]), providing in part:

" . . . *Provided, however,* The owner of a victory motor vehicle shall be liable in the operation of said victory motor vehicle to the employees of the defense plant transported in his victory motor vehicle only for death or personal injury caused by the gross negligence of said owner or his agent."

Section 14 (Rem. Supp. 1943, § 6397-43 [P.P.C. § 746w-41]), as follows:

"It is hereby declared to be the intention of the Legislature that unaltered private passenger cars and other motor vehicles of six (6) passengers or less seating capacity, exclusive of the driver, used exclusively for the purpose of carrying for compensation *employees of defense plants* to and from said defense plants, shall be exempted from regulation under the provisions of this act and shall not be required to comply with the regulatory provisions of any law peculiar to the licensing and operation of for-hire vehicles. Nothing herein shall be deemed to exempt the owners and/or operators of the cars or vehicles mentioned in this section from the provisions of the Uniform Motor Vehicle Safety Responsibility Act of this state." (Italics ours.)

This act does not deal with the relation between carriers and the public generally. It deals only with those members of the bus-riding public who were engaged at the time in employment in defense plants. Clearly, the act segregates defense workers who rode to and from their places of employment in public carriers of the motor vehicle type. This segregation relates solely to the burden of proof imposed upon defense workers suing for damages for personal injuries sustained while riding as passengers in public carriers of the type referred to, and is evidenced by the following three classes defined in the act:

(1) Defense workers who ride to and from their work in the motor vehicle equipment of established transportation lines. Such defense workers, if injured while riding as passengers, are permitted to sue under the general common-law rule prevailing in this state, namely, that the carrier is held to the highest degree of care for the safety of its passengers, and the plaintiff is required to prove only slight negligence on the part of the carrier.

(2)   Those defense workers who ride to and from their work in motor vehicles having a carrying capacity of six passengers, or less, exclusive of the driver, and who pay the owner a fixed fare.  A defense worker injured while riding in a vehicle of this class would also come under the "slight negligence" rule, should he seek to recover damages for his injuries from the owner of the vehicle or his insurer.

(3)   Defense workers riding in a victory motor vehicle having a carrying capacity of more than six passengers, exclusive of the driver, who are injured and desire to bring suit, are required to prove that the owner or operator of the vehicle in which they were injured was guilty of *gross negligence* in its operation.

The first question to determine is whether the victory motor vehicle act violates the provisions of Art I, § 12, of our state constitution, which provides:

"No law shall be passed granting to any citizen, class of citizens, or corporation, other than municipal, privileges or immunities which, upon the same terms, shall not equally belong to all citizens or corporations."

It is not necessary to list an extended line of judicial authority to sustain our view that this is discriminatory class legislation.  However, we mention those few decisions from this court which have construed, as unconstitutional, legislation which is almost as extreme in its discriminatory provisions as that now under consideration. *Kaufman v. West,* 133 Wash. 192, 233 Pac. 321.  This case declared an ordinance of the city of Seattle, which prohibited *occupants of apartment houses only* from parking their automobiles on one side of a street, to be violative of Art. I, § 12, of the state constitution.  In that case, the court said, with reference to the ordinance:

"It is unjust, unreasonable and discriminatory in that it does not operate alike on all persons and property under the same circumstances and conditions, and is therefore class legislation in discriminating against some and favoring others.  It presents nothing but an arbitrary selection and as such is invalid."

*Sherman Clay & Co. v. Brown,* 131 Wash. 679, 231 Pac. 166, construed an ordinance of the city of Chehalis which sought to regulate dealers in secondhand goods, but exempted dealers in secondhand stoves, furniture, or the total contents of any room or house from its provisions. The ordinance was held to violate Art. I, § 12, of the state constitution. This court said:

"In other words, as noted in the *Macho* case, *supra,* what is attempted to be done here is to exempt a class within a class. Certain kinds of second-hand dealers are allowed certain privileges and immunities not granted to the balance, and this without any reasonable distinction between the characters of their businesses.

"In *State v. Robinson Co.,* 84 Wash. 246, 146 Pac. 628, the court was concerned with an act requiring the recording of the sale of concentrated commercial feed stuffs, and, in holding that act unconstitutional, we said:

" 'We are satisfied that, under the rule in these cases, the act under consideration is clearly in violation of the constitutional provision quoted, because it authorizes cereal and flour mills to sell mixed and unmixed feeding stuffs, while other persons selling the same feeding stuffs are required to comply with the provisions of the act. It is plain, we think, that § 13, . . . for that reason, renders the whole act void.' "

In *State ex rel. Bacich v. Huse,* 187 Wash. 75, 59 P. (2d) 1101, this court held that Rem. Rev. Stat. (Sup.), § 5671-4 [P.P.C. § 542-7], regulating the salmon industry, was unconstitutional for the reason that it granted special privileges and denied the equal protection of the laws, since it gave the right to fish with gill nets to all persons who held licenses in the years 1932 and 1933 for the remainder of their lives, while all others were to be prohibited. The court held further that this classification was not predicated upon any natural, fair, or just basis of selection and was wholly arbitrary and capricious. The language of the court in that opinion is applicable to the situation presented here:

"The aim and purpose of the special privileges and immunities provision of Art. I, § 12, of the state constitution and of the equal protection clause of the fourteenth amend-

ment of the Federal constitution is to secure equality of treatment of all persons, without undue favor on the one hand or hostile discrimination on the other.

"To comply with these constitutional provisions, legislation involving classifications must meet and satisfy two requirements: (1) The legislation must apply alike to all persons within the designated class; and (2) reasonable ground must exist for making a distinction between those who fall within the class and those who do not."

See, also, *Inman v. Sandvig*, 170 Wash. 112, 15 P. (2d) 696; *Spokane v. Macho*, 51 Wash. 322, 98 Pac. 755, 30 Am. St. 1100, 21 L. R. A. (N.S.) 263.

■ The limitation placed upon the right of action of an injured defense worker, riding as a paid passenger in a public carrier of specified seating capacity, is arbitrary and a grant of privilege and immunity to all other defense workers riding as paid passengers in all other types or classes of motor passenger carriers for hire.

■ Having eliminated the requirement that gross negligence must be proved before an action by the passengers will lie against the operator of a victory motor vehicle and his insurer, there remains the common-law rule that respondent Wilson, being the owner of a carrier of passengers for hire, was required to exercise the highest degree of care for the safety of such passengers. Appellant, in suing for personal injuries, is required to prove only slight negligence. See *Anderson v. Harrison*, 4 Wn. (2d) 265, 103 P. (2d) 320.

Following are the salient points of evidence upon which appellant's case is based:

The licensed victory motor vehicle, in which appellant was riding on the day he alleges his injuries were sustained, was a 1939 model, secondhand, worn-out piece of equipment, capable of seating thirty-three passengers. Its two-wheel brakes were not in adequate working order. The driver testified that, in most instances, when he desired to bring the vehicle to a stop, it was necessary for him to pull back into second gear in order to race the motor and increase the air pressure in the braking cylinders. The driver's exact testimony in this respect was:

"A. Well, the next gear would be second gear. I would throw the bus into second gear; it would be lower gear, and that would turn the motor faster and it would keep the air pressure built up. Q. So when you came to a stop sign or a place you knew you had to stop you could manage the brakes by putting it in second gear, is that it? A. That is right. I was used to it and I could throw it into second gear. Well, it came as handy doing that as putting the brake on, but in that accident I didn't have time to change gears with it and I wasn't expecting to, and it jerked the wheel and I didn't have time to change gears with it. . . . Q. Why was it that you ordinarily put the car in second gear? A. Well, to be safe and sure that I had enough air whenever I wanted to stop when I got there that I could stop. Q. How often had you reported this condition to Mr. Wilson? A. Well, I had told him about it, you know, asked him about it and that was, you know, the situation of it."

He testified further, in describing the accident and his effort to bring the vehicle to a stop after the blowout:

"Well, I had plenty of room, that is true enough, and I tried to pull it back on the road. The bus was still leaning. Then I tried to put the brakes on and that gave it another tendency like it wanted to turn over. Relaxing the brake a few times it let the air out of the air-drum and it didn't have enough brakes to stop it within this distance down here (indicating)."

Appellant was riding in the rear seat of the vehicle. At a point approximately nine hundred feet south of a Milwaukee railroad crossing with the highway, the right front tire blew out and was immediately thrown off the rim of the wheel. Under the evidence of the various witnesses, including the operator, the vehicle then rolled for approximately nine hundred to one thousand feet along the highway, which was level and without grade at this point, over to the shoulder of the road and, finally, clear of the pavement and shoulder and down into a ditch over which the highway passed at almost a right angle. This ditch had abrupt banks four or five feet in height. Appellant suffered no injuries as a result of the tire blowout and

none while the vehicle was rolling along the pavement and shoulder, but, when it struck the bank of the ditch and lurched down, he was thrown from the rear seat to the front of the vehicle, near the driver, and it was at this point that he sustained the injuries for which he seeks recovery in this action.

It is clear that the brakes on this public carrier of passengers were inadequate to perform the functions intended for brakes, namely, to decelerate or stop the vehicle, particularly in an emergency. According to the testimony of the driver, which we have quoted, his method of bringing the vehicle to a stop was to switch into second gear in order to race the motor and build up the necessary air pressure to make the brakes apply. Without question, respondent Wilson, the owner, was guilty of negligence in continuing to operate the bus with defective brakes. It is clear from the record that its condition had been called to his attention, even on the day of the accident. Under our decisions, he was, in all probability, guilty of gross negligence, but, as we view this case, he is liable if guilty of even slight negligence in the operation of the victory motor vehicle.

There was evidence from the appellant and another passenger in the vehicle that it was being operated at a speed of fifty miles per hour at the time of the blowout, which occurred on a long, slightly arcing curve of the highway. We are convinced that it was negligence for the operator of the bus, knowing the condition of the brakes, to propel this vehicle over the road at a rate of fifty miles an hour; for he is charged with the knowledge that, in the event of sudden emergency, whether it should be an impending collision, a blowout, or any other necessity for an emergency stop, the brakes were not in condition to permit him to make such stop. This was the proximate cause of the appellant's injury, and there was sufficient evidence to permit a jury to consider whether or not either of the suggested classes of negligence, namely, the maintenance and operation of the vehicle with defective brakes or the

operation of it at a rate of speed of fifty miles an hour, knowing that the brakes were defective, was present.

█ Operation of a motor vehicle with knowledge that the brakes are defective has always been recognized as negligence by this court. It is likewise statutory negligence, for our motor vehicle code, Rem. Rev. Stat., Vol. 7A, § 6360-34 [P.P.C. § 286-1], provides:

"Every motor vehicle, other than a motorcycle, when operated upon a public highway shall be equipped with brakes adequate to control the movement of and to stop and to hold such vehicle, including two separate means of applying such brakes, each of which means shall be effective to apply the brakes to at least two wheels. . . .

"The service brakes upon any motor vehicle or combination of vehicles shall be capable of bringing such vehicle or combination of vehicles to a complete stop at a rate of deceleration equivalent to a stop within thirty-five (35) feet from a speed of twenty (20) miles per hour when upon dry asphalt or concrete pavement the surface of which is free from loose material and the grade of which does not exceed one (1) per cent: . . .

" . . . All brakes shall be maintained in good working order and shall be so adjusted as to operate as equally as practicable with respect to the wheels on opposite sides of the vehicles. . . ."

In this case, there was substantial evidence that the vehicle traveled approximately eight hundred feet after the brakes were first applied, immediately following the tire puncture, and that there was no appreciable deceleration of its speed until it had left the highway and struck the earthen bank of the ditch.

In *Forman v. Shields,* 183 Wash. 333, 48 P. (2d) 599, this court held that it was for the jury to determine whether or not it was negligence for the owner of a car equipped with defective brakes to turn it over to an inexperienced driver, when he knew at the time that the brakes were not in proper working order.

In *Trunk v. Wilkes,* 162 Wash. 114, 297 Pac. 1091, this court said:

"The question is finally reduced to whether the appellant, in failing to inform Critzer of the defective condition of the

brakes, was guilty of gross negligence. The appellant says that, as a matter of law, the evidence was insufficient for that purpose; the respondent says that the question was one of fact for the jury. The respondent being the guest of the appellant, it was necessary for him to show facts from which the jury might find gross negligence, which is the failure to exercise slight care. *Saxe v. Terry*, 140 Wash. 503, 250 Pac. 27; *Blood v. Austin*, 149 Wash. 41, 270 Pac. 103. Whether, in the exercise of slight care, it was the duty of the appellant to inform Critzer of the defective brakes on the automobile, it seems to us was a question of fact. In *Eastman v. Silva*, 156 Wash. 613, 287 Pac. 656, it was held that the question of whether one driving an automobile having defective steering gear, of which he had knowledge, was guilty of gross negligence was a question of fact. If the brakes were in the condition that the testimony of the witness who drove the car on the prior occasion would indicate, it cannot be held, as a matter of law, that the appellant, in intrusting the automobile to Critzer without informing him of the defective condition of the brakes, was not guilty of gross negligence."

We held, in *Eastman v. Silva*, 156 Wash. 613, 287 Pac. 656, that the operation of a motor vehicle with a defective steering gear constituted gross negligence. The court said:

"Premising our discussion upon our own definition of 'gross negligence' as the want of slight care, which is also the generally accepted definition, were the facts and circumstances shown in this case tantamount to gross negligence? Assuming, also, the fact found by the trial court, which was testified to by appellant, that he knew of the defect in the steering gear of his car for as long as three months preceding the accident causing him to lose control of the car as it caused him to go into the ditch twice before; that the same performance occurred on this trip, about four hundred feet before the point where the accident occurred and at that time respondent had requested appellant to stop and let her out, which he declined to do, we feel bound to conclude that, under our decisions, gross negligence was shown.

"Where an automobile is out of repair so as to be unmanageable, it is such a dangerous instrumentality that it is negligence to allow its use on the highway, and the owner is liable for an injury caused by the operation of such

a car, even though his agent in charge thereof is not negligent. [Citing cases.]"

See, also, 3-4 Huddy, Cyclopedia of Automobile Law (9th ed.) 129, § 72; *Ziskovsky v. Miller,* 120 Neb. 255, 231 N. W. 809; *Rochefort v. Teche Lines, Inc.,* 186 So. (La. App.) 751.

For the foregoing reasons, the judgment of the trial court is reversed, and the cause is remanded to the superior court of Lewis county for further proceedings.

MILLARD, STEINERT, JEFFERS, SCHWELLENBACH, and HILL, JJ., concur.

SIMPSON, J., concurs in the result.

MALLERY, C. J., and ROBINSON, J., dissent.