[Nos. 70090-7; 70499-6; 73589-1. En Banc.]
Argued March 25, 2003. Decided January 29, 2004.

GRANT COUNTY FIRE PROTECTION DISTRICT NO. 5, ET AL., *Appellants*, v. THE CITY OF MOSES LAKE, *Respondent*.

YAKIMA COUNTY FIRE PROTECTION DISTRICT NO. 12, ET AL., *Appellants*, v. THE CITY OF YAKIMA, *Respondent*.

THE CITY OF SNOQUALMIE, ET AL., *Appellants*, v. THE WASHINGTON STATE BOUNDARY REVIEW BOARD FOR KING COUNTY, *Respondent*.

792

794

*Clark B. Snure* and *Brian K. Snure* (of *Snure Law Offices*); *Patrick B. Anderson*; and *Richard M. Peterson* and *Brian D. Todd* (of *Hillis Clark Martin & Peterson, P.S.*), for appellants.

*Hugh D. Spitzer, P. Stephen DiJulio,* and *Ramsey E. Ramerman* (of *Foster Pepper & Shefelman, P.L.L.C.*); *Robert C. Kaufman*; and *Michael M. Wyman* and *James A. Whitaker* (of *Lemargie & Whitaker*), for respondent City of Moses Lake.

*Thomas E. Kelly, Jr., Matthew J. Segal, Elizabeth Thomas,* and *Roger D. Wynne* (of *Preston Gates & Ellis L.L.P.*); and *Raymond L. Paolella, City Attorney,* and *Lawrence A. Peterson, Assistant,* for respondent City of Yakima.

*Christine O. Gregoire, Attorney General,* and *Narda D. Pierce, Solicitor General,* for respondent Washington State Boundary Review Board for King County.

*Gregory A. Rubstello, Joseph Z. Lell,* and *Daniel B. Heid* on behalf of Washington Association of Municipal Attorneys and Association of Washington Cities, amici curiae.

*Kristopher I. Tefft* on behalf of Association of Washington Business, Building Industry Association of Washington, Central Washington Home Builders Association, National Association of Industrial and Office Properties, and Washington Association of Realtors, amici curiae.

*Christine O. Gregoire, Attorney General, William B. Collins, Senior Assistant,* and *Cameron G. Comfort, Assistant,* on behalf of the Attorney General's Office and Governor Gary Locke, amici curiae.

*Philip A. Talmadge* on behalf of Franklin County, Spokane County, Moses Lake Property Owners, and Washington Fire Commissioners Association, amici curiae.

BRIDGE, J. — In *Grant County Fire Protection District No. 5 v. City of Moses Lake*, 145 Wn.2d 702, 42 P.3d 394 (2002) (*Grant County* I), this court held that the petition method of annexation affords an impermissible privilege to owners of highly valued land, and therefore violates article I, section 12 of the Washington State Constitution. Motions for reconsideration were filed by the cities of Moses Lake and Yakima. After review, we granted the motions and ordered a rehearing. For the rehearing, we consolidated *City of Snoqualmie v. Washington State Boundary Review Board*, No. 73589-1, with the two original cases. We now conclude that the petition method utilized by the cities of Moses Lake and Yakima is *not* unconstitutional and that the petition method of annexation employed by the city of Snoqualmie *is* constitutional.

I

These consolidated cases present challenges under article I, section 12 of the Washington State Constitution to the

petition method for property annexation.[1] The primary distinction between the city of Moses Lake's case and the city of Yakima's case is the statute involved. Moses Lake is a "code city" that chose to be incorporated under chapter 35A.14 RCW, whereas Yakima is a "noncode city" operating under chapter 35.13 RCW.

## City of Moses Lake Annexation[2]

Because Moses Lake is a code city, chapter 35A.14 RCW requires two steps for the petition method of annexation. First, the owners of at least 10 percent of the assessed value of the property in the proposed area of annexation must sign a notice of intent to petition. If the city council accepts the notice, owners of at least 60 percent of the assessed value must sign a petition in order for the annexation to proceed. The municipality has final control over whether annexation is granted.

On May 11, 1999, the city manager, acting as attorney in fact for at least 10 percent of the Wheeler Corridor property owners, filed a notice of intent to petition the city council for annexation pursuant to chapter 35A.14 RCW. The city council accepted the notice, and on June 8 the council directed the city manager, as attorney in fact for 60 percent of the Wheeler Corridor property owners, to sign an annexation petition. Some property owners protested this annexation; however, the city council approved the petition for annexation and published the ordinance in April of 2000.

Several property owners and the Grant County Fire Protection District No. 5 filed an application for writ of review and a complaint for declaratory judgment contesting the constitutionality of the petition method of annexation. The Grant County Superior Court granted summary judg-

---

[1] In *Grant County* I, the appellants also claimed that the petition method of annexation was unconstitutional under the equal protection clause, amendment XIV, section 1 of the United States Constitution and article I, section 19 of the Washington State Constitution. We held that it was not. These claims are not under reconsideration.

[2] This opinion provides a simplified version of the facts. More detailed facts may be found in this court's first opinion for this case, *Grant County* I.

ment in favor of Moses Lake, ruling that the petition method of annexation is constitutional. Plaintiffs filed a motion for reconsideration, which was denied. Plaintiffs timely appealed to Division Three of the Court of Appeals, and the appeal was transferred to this court.

## City of Yakima Annexation

Because Yakima is a noncode city, annexation is governed by chapter 35.13 RCW, which parallels the procedure for code cities, but with some differences. Specifically, the initial notice of intent to petition under chapter 35.13 RCW may be signed either by the owners of at least 10 percent of the assessed value of the proposed annexation area or by at least 10 percent of the property owners. The property owners must also file a notice of intent to annex with the Washington State Boundary Review Board (BRB) which then approves, disapproves, or modifies the proposed annexation. If the city council accepts the notice of intent, owners of at least 75 percent of the assessed value must sign a petition conforming to the requirements of the BRB before annexation may proceed. The ultimate determination to annex lies with the municipality.

Yakima initiated annexation proceedings in June of 1999. The BRB modified the proposed annexation, and despite opposition from the Yakima County Fire Protection District No. 12 (YCFPD12) and a property owner, the city adopted an ordinance annexing the area as modified by the BRB.

Several property owners and the YCFPD12 filed suit seeking a declaration that the petition method of annexation is unconstitutional. The Yakima County Superior Court granted summary judgment in favor of the city of Yakima, finding that the petition method was constitutional. The plaintiffs filed a timely notice of appeal.[3]

This court heard oral argument in these consolidated cases on March 20, 2001. The majority opinion, which was

---

[3] Yakima County Clerk's Papers at 26-27.

filed on March 14, 2002, held, in pertinent part, that Washington State's privileges and immunities clause should be analyzed separately from the equal protection clause of the United States Constitution. Using that independent analysis, we concluded that while the petition method did not violate the equal protection clause, the petition method did violate article I, section 12 of the Washington State Constitution because it granted an impermissible privilege to owners of highly valued land. The cities of Moses Lake and Yakima filed motions for reconsideration asking this court to clarify and reconsider several issues in light of the potentially unsettling implications of the opinion. This court granted the motions for reconsideration and ordered a rehearing on October 11, 2002.

### City of Snoqualmie Annexation

On February 23, 2003, we granted a request to consolidate *City of Snoqualmie v. Washington State Boundary Review Board*, No. 73589-1, with the two cases at hand. The main issue in *City of Snoqualmie* is whether *Grant County* I declared the petition method facially unconstitutional or unconstitutional as applied.[4]

The city of Snoqualmie, like the city of Moses Lake, is a noncharter code city, and is therefore governed by Title 35A RCW. In dispute is the annexation of 40.3 acres of undeveloped land. This property is owned by Gateway Cascades, Inc. (Gateway) and is located in unincorporated King County within the Snoqualmie Falls planning area as defined by the 1994 Snoqualmie Vicinity Comprehensive Plan and within the city's urban growth area. There are no other owners of lesser-valued property within the area proposed for annexation by Gateway. Further, there are no voters or persons residing within the area proposed for annexation.

---

[4] In *Grant County* I it was unclear whether the plaintiffs were asserting that the petition method of annexation was facially unconstitutional or unconstitutional as applied.

On April 23, 2001, the city of Snoqualmie and Gateway entered into an annexation process agreement by which the city of Snoqualmie accepted Gateway's notice and authorized the filing of an annexation petition. On January 22, 2002, Gateway submitted its annexation petition to the city of Snoqualmie, which was certified by the King County assessor as required by RCW 35A.01.040. RCW 36.93.090 requires the city of Snoqualmie to file a notice of intention to annex with the BRB before annexing the property. On May 20, 2002, the BRB wrote a letter to the city of Snoqualmie stating that the BRB lacked authority to accept and process a notice of intention to annex in light of this court's decision in *Grant County* I. The city of Snoqualmie requested the BRB to reconsider its decision, but it declined.

Because of the BRB's refusal to commence the annexation process, the city of Snoqualmie and Gateway filed suit and moved for summary judgment, seeking an order declaring that the petition method of annexation is not facially unconstitutional under *Grant County* I. In an order dated February 17, 2003, Judge Michael J. Trickey, also citing *Grant County* I, denied the summary judgment motion and found for the BRB. The city of Snoqualmie and Gateway, jointly with the BRB, petitioned this court for direct review and to decide the matter concurrently with its reconsideration of *Grant County* I.[5] We granted the petition and consolidated *City of Snoqualmie* with this reconsideration of *Grant County* I.

## II

### Standing

In *Grant County* I, this court held that the property owners as well as the fire districts had personal standing to bring these challenges. On reconsideration, we conclude that the fire districts have neither personal nor representational standing.

---

[5] Annexation has been suspended pending this court's reconsideration of *Grant County* I.

■■ To find that a party has personal standing in order to seek a declaratory judgment, the Uniform Declaratory Judgments Act (UDJA), chapter 7.24 RCW, states:

> A person . . . whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder.

RCW 7.24.020. To establish harm under the UDJA, a party must present a justiciable controversy based on allegations of harm personal to the party that are substantial rather than speculative or abstract. *Walker v. Munro*, 124 Wn.2d 402, 411, 879 P.2d 920 (1994). This statutory right is clarified by the common law doctrine of standing, which prohibits a litigant from raising another's legal right. "The kernel of the standing doctrine is that one who is not adversely affected by a statute may not question its validity." *Id.* at 419.

■ This court has established a two-part test to determine standing under the UDJA. The first part of the test asks whether the interest sought to be protected is " 'arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.' " *Save a Valuable Env't v. City of Bothell*, 89 Wn.2d 862, 866, 576 P.2d 401 (1978) (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 152-53, 90 S. Ct. 827, 25 L. Ed. 2d 184 (1970)). The second part of the test considers whether the challenged action has caused " 'injury in fact,' " economic or otherwise, to the party seeking standing. *Id.* at 866. Both tests must be met by the party seeking standing.

■ The property owners in this case clearly have standing to bring this action. The petition method was adopted as an alternative form of annexation specifically to protect the interest of property owners. *See* RCW 35.13.130; RCW 35A.14.120. Likewise, the property owners satisfy the re-

quirements of actual injury for the "injury in fact" test because they face different tax rates following annexation.

■ However, it cannot be said with equal clarity that in these circumstances the fire districts have personal standing. Since the statutes in question were not designed to protect their interests, they are not within the zone of interest. Because the fire districts fail the zone of interest test, they cannot have personal standing.

■ The fire districts alternatively assert representational standing. In addition to personal standing, this court has recognized that a party may also have standing in a representative capacity. *City of Seattle v. State*, 103 Wn.2d 663, 669, 694 P.2d 641 (1985). For example, municipalities acting on behalf of their residents have standing to raise constitutional issues. *Id.* Further, when a controversy is of substantial public importance, immediately affects significant segments of the population, and has a direct bearing on commerce, finance, labor, industry, or agriculture, this court has been willing to take a "less rigid and more liberal" approach to standing. *Wash. Natural Gas Co. v. Pub. Util. Dist. No. 1 of Snohomish County*, 77 Wn.2d 94, 96, 459 P.2d 633 (1969). However, we have applied this liberal approach to standing only in cases where the plaintiff whose standing was challenged was the *only* plaintiff in the case and the liberal approach was necessary to ensure that the important public issues raised did not escape review. *Yakima County Fire Prot. Dist. No. 12 v. City of Yakima*, 122 Wn.2d 371, 380, 858 P.2d 245 (1993) (denying standing to fire district upon finding that the argument raised could be more effectively argued by the other plaintiffs in the case).[6]

---

[6] *See also Seattle*, 103 Wn.2d at 668 (Seattle was the only plaintiff, and this court allowed it to raise an equal protection challenge to a portion of an annexation statute); *Farris v. Munro*, 99 Wn.2d 326, 329-30, 662 P.2d 821 (1983) (plaintiff did not have personal standing, but this court liberally found standing in order to allow the important issue of the constitutionality of the state lottery act to be resolved); *Vovos v. Grant*, 87 Wn.2d 697, 701, 555 P.2d 1343 (1976) (allowing public defender to raise an issue of public importance to juveniles who would have "difficulty . . . [in] vindicat[ing] their rights on their own").

Moses Lake argues that the fire districts do not have standing under the representational standing doctrine. Moses Lake asserts that the fire districts are limited-purpose districts and hence do not have the same representative capacity for residents in the annexation process as a city does for potential residents,[7] or juvenile public defenders do for the criminal justice system,[8] or school districts do for students in the funding of education.[9] The fire districts, however, argue that since they are governed by elected boards of commissioners, they have a duty to their electorate to ensure that the districts maintain the capability to provide emergency fire protection and emergency medical services to the residents of the districts and to represent that electorate in legal challenges of this kind.

■ On balance, we now agree with the city of Moses Lake. There is no evidence in the record to show that the residents would receive less effective fire protection or other emergency services from Moses Lake or Yakima than they now receive from the fire districts. The only interest sought to be protected by the fire districts is the protection of their tax base. As held in *Steilacoom Historical School District No. 1 v. Winter*, efforts to increase or secure a tax base are not an issue that involves a "controversy of serious public interest such that standing requirements will be applied more liberally." 111 Wn.2d 721, 725, 763 P.2d 1223 (1988). Therefore, we conclude that the fire districts do not have representational standing in these consolidated cases. Since the property owners *do* have personal standing to bring forth the constitutional claims against the petition method of annexation, we need not apply a liberal approach to standing in order to assure that the issues are properly reviewed. We now turn to those issues.

---

[7] *See Seattle*, 103 Wn.2d at 668 (city of Seattle had standing to raise an equal protection challenge to a portion of an annexation statute on behalf of its residents).

[8] *See Vovos*, 87 Wn.2d at 701 (public defender had standing to raise an issue of public importance on behalf of juveniles he represented).

[9] *See Seattle Sch. Dist. No. 1 v. State*, 90 Wn.2d 476, 493-94, 585 P.2d 71 (1978) (school district had standing to challenge legislation on behalf of its students).

# III

## *Gunwall* Analysis: State Constitution Provides for Independent Analysis

As in *Grant County* I, on reconsideration we hold that the privileges and immunities clause of the Washington State Constitution, article I, section 12, requires an independent constitutional analysis from the equal protection clause of the United States Constitution.[10]

Before *Grant County* I, this court had yet to reach such a conclusion. However, the United States Supreme Court has suggested that annexation is a suitable topic for state constitutional analysis. In *Hunter v. City of Pittsburgh*, the Supreme Court held that while a state at its pleasure may expand or contract the territorial area with or without the consent of the citizens, unrestrained by the United States Constitution, such state action must conform to its state constitution. 207 U.S. 161, 178-79, 28 S. Ct. 40, 52 L. Ed. 151 (1907). And, although in recent cases this court has held that the privileges and immunities clause is substantially similar to the equal protection clause, *Seeley v. State*, 132 Wn.2d 776, 788, 940 P.2d 604 (1997), the possibility that article I, section 12 could be analyzed separately from the federal equal protection clause has been left open. *In re Det. of Turay*, 139 Wn.2d 379, 412 n.24, 986 P.2d 790 (1999). *See also In re Pers. Restraint of Mota*, 114 Wn.2d 465, 472, 788 P.2d 538 (1990) (declining to address greater protection issue because the parties did not properly brief and/or argue the issue); *Sofie v. Fibreboard Corp.*, 112 Wn.2d 636, 640-42, 771 P.2d 711, 780 P.2d 260 (1989) (holding that, if properly presented, interpretation of article I, section 12 could require a separate analysis).

---

[10] Although the United States Constitution also has a privileges and immunities clause, federal jurisprudence has focused on the federal equal protection clause in cases involving differential treatment. Therefore, when determining whether the Washington privileges and immunities clause provides more protection than the United States Constitution, this court has always compared it with the federal equal protection clause rather than the federal privileges and immunities clause.

■ In determining that our state constitutional provision requires a separate and independent constitutional analysis from the United States Constitution, we consider six nonexclusive neutral criteria: (1) the textual language of the state constitution, (2) differences in the texts of parallel provisions of the federal and state constitutions, (3) state constitutional and common law history, (4) preexisting state law, (5) structural differences between the federal and state constitutions, and (6) matters of particular state or local concern. *State v. Gunwall*, 106 Wn.2d 54, 58, 720 P.2d 808 (1986).

## Gunwall *Factors One and Two*

■ Factors one and two of the *Gunwall* analysis focus on the textual language of the provision and the extent to which that language differs from that of the federal constitution. *Gunwall*, 106 Wn.2d at 61. Here, the text of the clause in each constitution varies significantly. Washington Constitution article I, section 12 states:

> No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations.

United States Constitution amendment XIV, section 1 provides, in relevant part:

> No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state . . . deny to any person within its jurisdiction the equal protection of the laws.

Analyzing the texts of the federal and state constitutions, we find it becomes apparent that the federal constitution is concerned with majoritarian threats of invidious discrimination against nonmajorities, whereas the state constitution protects as well against laws serving the interest of special classes of citizens to the detriment of the interests of

all citizens.[11] Because of the difference in language, this court has previously held that it "should not foreclose the possibility that there may be a context where [the clause] should be independently examined." *Gossett v. Farmers Ins. Co. of Wash.*, 133 Wn.2d 954, 976, 948 P.2d 1264 (1997). Also, the difference in emphasis between the two constitutional provisions suggests that it is necessary to analyze the state provision separately from the federal provision.

> Thus, one might expect that the state provision would have a harder "bite" where a small class is given a special benefit, with the burden spread among the majority. On the other hand, the Equal Protection Clause would bite harder where majority interests are advanced at the expense of minority interests.

Jonathan Thompson, *The Washington Constitution's Prohibition on Special Privileges and Immunities: Real Bite for "Equal Protection" Review of Regulatory Legislation?*, 69 TEMP. L. REV. 1247, 1251 (1996).

### Gunwall *Factor Three*

 Factor three of the *Gunwall* analysis instructs us to consider the constitutional history of the provision to determine whether the framers of the Washington State Constitution intended to confer different protection than is offered by the federal constitution. *Gunwall*, 106 Wn.2d at 61. Article I, section 12 of the Washington State Constitution was modeled after article I, section 20 of the Oregon State Constitution. THE JOURNAL OF THE WASHINGTON STATE CONSTITUTIONAL CONVENTION, 1889, at 501 n.20 (Beverly

---

[11] Article I, section 12 of the Washington State Constitution was adopted from article I, section 20 of the Oregon State Constitution. THE JOURNAL OF THE WASHINGTON STATE CONSTITUTIONAL CONVENTION, 1889, at 501 n.20 (Beverly Paulik Rosenow ed., 1999). Therefore, the Oregon Supreme Court's comments on the differences between the languages of the two provisions are illustrative. *See State v. Smith*, 117 Wn.2d 263, 285, 814 P.2d 652 (1991) (Utter, J., concurring). The Oregon Supreme Court has stated: " 'The provisions of the state Constitution are the antithesis of the fourteenth amendment in that they prevent the enlargement of the rights of some in discrimination against the rights of others, while the fourteenth amendment prevents the curtailment of rights.' " *State v. Clark*, 291 Or. 231, 236 n.8, 630 P.2d 810 (1981) (quoting *State v. Savage*, 96 Or. 53, 59, 184 P. 567 (1919)).

Paulik Rosenow ed., 1999). Thus, we may look to interpretations of the Oregon privileges and immunities clause for guidance. *See State v. Smith*, 117 Wn.2d 263, 287, 814 P.2d 652 (1991) (Utter, J., concurring). The Oregon court interprets its privileges and immunities clause independently from the federal constitution, holding that the state provision is triggered whenever a person is denied a privilege to which he would be entitled but for government interference. *State v. Freeland*, 295 Or. 367, 369-70, 667 P.2d 509 (1983).

The Washington provision differs from that of the Oregon provision only in that the Washington provision added a reference to corporations, which our framers perceived as manipulating the lawmaking process. Thompson, 69 TEMP. L. REV. at 1253. Washington's addition of the reference to corporations demonstrates that our framers were concerned with undue political influence exercised by those with large concentrations of wealth, which they feared more than they feared oppression by the majority. Brian Snure, Comment, *A Frequent Recurrence to Fundamental Principles: Individuals Rights, Free Government, and the Washington State Constitution*, 67 WASH. L. REV. 669, 671-72 (1992); Thompson, 69 TEMP. L. REV. at 1253 (alteration of Oregon model "reflected the contemporary populist suspicion of the political influence accompanying large concentrations of wealth"). Our framers' concern with avoiding favoritism toward the wealthy clearly differs from the main goal of the equal protection clause, which was primarily concerned with preventing discrimination against former slaves. *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36, 81, 21 L. Ed. 394 (1872).

The distinct histories of the state and federal provisions were succinctly described by Justice Utter in a concurring opinion in *State v. Smith*:

> The Fourteenth Amendment was enacted after the Civil War and its purpose was to eliminate the effects of slavery. It was intended to guarantee that certain classes of people (blacks) were not denied the benefits bestowed on other classes (whites), thereby granting equal treatment to all persons.

Enacted after the Fourteenth Amendment, state privileges and immunities clauses were intended to prevent people from seeking certain privileges or benefits to the disadvantage of others. The concern was prevention of favoritism and special treatment for a few, rather than prevention of discrimination against disfavored individuals or groups.

117 Wn.2d at 283 (Utter, J., concurring). Therefore, the historical context as well as the linguistic differences indicates that the Washington State provision requires independent analysis from the federal provision when the issue concerns favoritism.[12]

### Gunwall *Factor Four*

■ Factor four of the *Gunwall* analysis directs examination of preexisting state law, which "may be responsive to concerns of its citizens long before they are addressed by analogous constitutional claims." *Gunwall*, 106 Wn.2d at 62. This factor requires us to consider the degree of protection that Washington State has historically given in similar situations. *Id.* at 61-62.

The limitation on government to grant special privileges to certain individuals or groups was recognized prior to the

---

[12] Early decisions of the Washington State Supreme Court that invalidated laws granting special advantages to certain people or classes of people also support this interpretation of the thrust of article I, section 12. *See State v. Robinson Co.*, 84 Wash. 246, 249-50, 146 P. 628 (1915) (invalidating statute that exempted cereal and flouring mills from act imposing onerous conditions on other similarly situated persons and corporations); *In re Application of Camp*, 38 Wash. 393, 397, 80 P. 547 (1905) (holding that city ordinance prohibiting anyone from peddling fruits and vegetables within city, but exempting farmers who grew produce themselves violated article I, section 12 as granting privilege to class of citizens); *City of Spokane v. Macho*, 51 Wash. 322, 323-26, 98 P. 755 (1909) (holding Spokane ordinance regulating employment agencies unconstitutional because it imposed criminal penalties upon one party, but imposed no penalties for others in like circumstances); *City of Seattle v. Dencker*, 58 Wash. 501, 504, 108 P. 1086 (1910) (invalidating Seattle ordinance as unconstitutional under article I, section 12 because it imposed tax upon sale of goods by automatic devices that was not imposed upon merchants selling same class of goods). However, if the law did not favor a particular person or class, it was upheld. *See State v. Carey*, 4 Wash. 424, 427, 429, 30 P. 729 (1892) (refusing to invalidate statute that respondent argued granted physicians on state examining board immunity from general physician licensing requirements because there was no basis for concluding that board members were in fact exempt).

adoption of the Washington Constitution in 1889. The Organic Act as revised provided that "legislative assemblies of the several Territories shall not grant private charters or especial privileges." U.S. REV. STAT. tit. 23, § 1889, at 333 (2d ed. 1878) (enacted by 43d Cong., 1st Sess. 1873-74). In *Hayes v. Territory of Washington*, 2 Wash. Terr. 286, 288, 5 P. 927 (1884), the Washington Territorial Court upheld a statute that restricted hunting in five counties against an attack under the Organic Act provision because the statute "[fell] without distinction upon all inhabitants of the Territory." *Id.*

Likewise, in several early cases, this court interpreted article I, section 12 independently from the federal provision and in a manner that focused on the award of special privileges rather than the denial of equal protection. *See, e.g., N. Springs Water Co. v. City of Tacoma*, 21 Wash. 517, 58 P. 773 (1899) (holding that franchise agreement between water utility and city council did not prevent city from building its own waterworks); *In re Application of Camp*, 38 Wash. 393, 80 P. 547 (1905) (invalidating ordinance that exempted farmers from ordinance forbidding anyone from peddling fruits and vegetables within city). In 1936, this court distinguished between the prohibition of "undue favor" (drawn from the state provision) and "hostile discrimination" (drawn from the Fourteenth Amendment):

> The aim and purpose of the special privileges and immunities provision of Art. I, § 12, of the state constitution and of the equal protection clause of the fourteenth amendment of the Federal constitution is to secure equality of treatment of all persons, without undue favor on the one hand or hostile discrimination on the other.

*State ex rel. Bacich v. Huse*, 187 Wash. 75, 80, 59 P.2d 1101 (1936), *overruled on other grounds by Puget Sound Gillnetters Ass'n v. Moos*, 92 Wn.2d 939, 603 P.2d 819 (1979). *See also Cotten v. Wilson*, 27 Wn.2d 314, 178 P.2d 287 (1947) (adhering to distinction articulated in *Huse* when invalidating law that required plaintiff to prove gross rather than ordinary negligence against owner or operator

of "victory motor vehicle"). Therefore, preexisting law seems to favor a separate analysis of article I, section 12.

## Gunwall *Factors Five and Six*

■■■ Factor five of the *Gunwall* analysis calls for us to examine the structural difference between the federal and state constitutions. *Gunwall*, 106 Wn.2d at 62. This court has previously stated that structural differences will always support an independent analysis. *See Seeley*, 132 Wn.2d at 789-90. *See also Smith*, 117 Wn.2d at 286 (listing several state constitutional protections not afforded citizens by federal constitution). The structural difference between the federal and state constitutions is apparent. Where the federal constitution is a grant of enumerated powers, the state constitution serves to limit the sovereign power, which directly lies with the residents and indirectly lies with the elected representatives. *Gunwall*, 106 Wn.2d at 62. Therefore, structural differences support an independent analysis.

■■■ Finally, factor six of the *Gunwall* analysis favors independent analysis if the matters at issue are of particular state interest or local concern. *Gunwall*, 106 Wn.2d at 62. Because annexation is a matter of state and local concern, it is more appropriately addressed by the state constitution. *See Hunter*, 207 U.S. at 178-79 (finding annexation questions suitable for independent state constitutional analysis).

■■■ For the reasons dictated by the preceding *Gunwall* analysis, we hold that article I, section 12 of the Washington State Constitution requires an independent constitutional analysis from the equal protection clause of the United States Constitution.

IV

The Petition Method of Annexation under Article I,
Section 12

For a violation of article I, section 12 to occur, the law, or its application, must confer a privilege to a class of citizens. The property owners contend that the petition method of annexation violates article I, section 12 of the state constitution by affording statutory authority to certain landowners to petition for annexation. They argue that the Washington State Constitution requires that changes in government be based on the consent of the governed, and that the petition method of annexation directly violates this fundamental principle by granting a special privilege that allows property owners to effect a change in government by commencing annexation without the consent of the governed. The property owners essentially contend that the right to petition the government for annexation is fundamental and is similar to the right to petition under article I, section 4 of the state constitution.

The city of Yakima, however, claims that petitioning the city for annexation is not a fundamental right under the Washington State Constitution. The city further argues that the ability to invoke a particular procedural method of annexation is neither a "privilege" nor an "immunity" the existence of which is a prerequisite to a violation of article I, section 12. Unless the statutory right to petition for annexation is a "privilege" within the meaning of article I, section 12, no unconstitutionality may be found.

There is settled law dictating that the statutory right to petition for annexation is not a privilege for purposes of article I, section 12. In this regard it must be remembered that not every statute authorizing a particular class to do or obtain something involves a "privilege" subject to article I, section 12. Instead, as this court made quite clear early in this State's history, the terms "privileges and immunities"

pertain alone to those fundamental rights which belong to the citizens of the state by reason of such citizenship. These terms, as they are used in the constitution of the United States, secure in each state to the citizens of all states the right to remove to and carry on business therein; the right, by usual modes, to acquire and hold property, and to protect and defend the same in the law; the rights to the usual remedies to collect debts, and to enforce other personal rights; and the right to be exempt, in property or persons, from taxes or burdens which the property or persons of citizens of some other state are exempt from. Cooley, Constitutional Limitations (6th ed.) 597. By analogy these words as used in the state constitution should receive a like definition and interpretation as that applied to them when interpreting the federal constitution.

*State v. Vance*, 29 Wash. 435, 458, 70 P. 34 (1902); *see also State ex rel. Cruikshank v. Baker*, 2 Wn.2d 145, 150-51, 97 P.2d 638 (1940); *Bussell v. Gill*, 58 Wash. 468, 476, 108 P. 1080 (1910).

▆▆▆▆ The statutory authorization to landowners to commence annexation proceedings by petition does not involve a fundamental attribute of an individual's national or state citizenship. Instead, the *legislature* enjoys plenary power to adjust the boundaries of municipal corporations and may authorize annexation without the consent of the residents and even over their express protest. "The sovereign power in a state to create, organize and classify cities includes the power to enlarge their limits by annexation." *State ex rel. Bowen v. Kruegel*, 67 Wn.2d 673, 679-80, 409 P.2d 458 (1965). While the State may delegate the "power of annexation to the cities and prescribe the mode, method and conditions by and under which the delegated authority may be exercised by the cities[,] . . . the ultimate power of annexation . . . rests exclusively in the state." *Id*. at 680; *see also Port of Tacoma v. Parosa*, 52 Wn.2d 181, 324 P.2d 438 (1958); *Wheeler Sch. Dist. No. 152 v. Hawley*, 18 Wn.2d 37, 137 P.2d 1010 (1943). The legislature, unless constrained by the constitution, "may . . . annex or authorize the annexation of contiguous or other territory *without the consent* and *even against the remonstrance of the majority of persons*

in either the annexed territory or the corporation to which it is being joined." *Bowen*, 67 Wn.2d at 680 (emphasis added). *See also Hunter*, 207 U.S. at 179 (by implication, no fundamental right to seek annexation as attribute of national citizenship). Thus, the citizens of the State have no fundamental right of citizenship to seek annexation. Nor do they have any such right to prevent annexation. The power is entirely that of the legislature, which may delegate to the cities.

 Moreover, this court has held that a " 'right simply of recommendation' " does not constitute a privilege within the meaning of article I, section 12—it " 'is not, in its very nature, such a fundamental right of a citizen that it may be said to come within the prohibition of the constitution, or to have been had in mind by the framers of that organic law.' " *Bussell*, 58 Wash. at 476-77 (quoting *Vance*, 29 Wash. at 458). The authority granted to landowners to petition for annexation is advisory only. The landowners have no authority to determine whether annexation occurs. Instead, if property owners of the proper percentage of assessed valuation in the area proposed to be annexed sign the annexation petition, the question of annexation goes to the city's legislative body for its final decision as to whether to annex. RCW 35.13.140; RCW 35A.14.130. The legislative body must hold a public hearing and invite interested persons to appear and voice approval or disapproval. RCW 35.13.140; RCW 35A.14.130. If, following the hearing, the legislative body decides to annex, it may annex all or any portion of the proposed area. RCW 35.13.150; RCW 35A.14.140. Thus, the legislative power to annex that has been constitutionally delegated to the city is in fact exercised by the city, not by the landowners. The landowners can only recommend annexation, demonstrated by signing a petition. The city may decline to annex, or may annex only a portion of the land recommended to be annexed.

 Thus, there is no privilege, i.e., fundamental right of state citizenship, at issue in this case, and the claim of a violation of article I, section 12 fails for this reason.

 The property owners argue, however, that the "right" to petition for annexation invokes the same constitutional ideals as the right to vote and the right to petition government in the sense that petitioning for annexation concerns the right of the governed to consent to their form of government. Thus, the property owners reason, the right to petition for annexation involves fundamental rights bringing article I, section 12 into play, and permitting landowners to commence an annexation process over the objections of the residents grants them this fundamental right while denying it to the residents. The argument is without merit.

First, as we held in *Grant County* I, and not subject to reconsideration, the landowner direct petition method for annexation does not violate the right to vote under article I, section 19 of the Washington State Constitution. *Grant County* I, 145 Wn.2d at 718 (no direct or indirect interference with the right to vote). We also found no infringement of the federal constitutional right to vote. *Id.* at 719-21. We further held in *Grant County* I, and the issue is not here on reconsideration, that the right to petition for annexation is not a fundamental right under the federal constitution. *Id.* at 721-22. This conclusion accords with *Hunter*, where the United States Supreme Court found no federal constitutional right related to annexation. *Hunter*, 207 U.S. at 179. Importantly, because there is no federal constitutional right at issue, *Hunter* also necessarily instructs that any "right" to petition for annexation plainly does not equate to the federal right to petition the government for a redress of grievances. *See* U.S. CONST. amend. I. This is significant because this court held, following a *Gunwall* analysis, that the state constitutional provision on the right to petition the government, article I, section 4 of the Washington State Constitution, is to be interpreted the same as the federal provision. *Richmond v. Thompson*, 130 Wn.2d 368, 380-81, 922 P.2d 1343 (1996). Accordingly, the right to petition government under article I, section 4, the parallel to the federal provision, does not involve any "right" to petition for

annexation at all, much less a fundamental constitutional right to petition for annexation.

The property owners have not established any right that constitutes a privilege within the meaning of the privileges and immunities clause.

V

The property owners in the cases of Moses Lake and Yakima have personal standing and are the proper plaintiffs/appellants in these consolidated cases. The fire districts, on the other hand, have neither personal standing nor representational standing.

After considering the *Gunwall* factors, we conclude that article I, section 12 of the Washington State Constitution provides a basis for constitutional challenge independent from the equal protection clause of the United States Constitution. Under this independent state analysis, we hold that the petition method of annexation statutes are constitutional because they do not implicate a fundamental right and do not afford any class a "privilege" or "immunity." Further, we note that our State's right to petition provision is to be interpreted in the same manner as the federal provision. Because the federal provision does not protect the right to petition the government for annexation, we must conclude that no such protection exists under our state constitution.

We, therefore, vacate *Grant County* I to the extent that it is inconsistent with this opinion. We affirm the trial courts' grants of summary judgment in the cases of the cities of Moses Lake and Yakima, and reverse the trial court's grant of summary judgment in the case of the city of Snoqualmie.

ALEXANDER, C.J.; JOHNSON, MADSEN, IRELAND, CHAMBERS, and OWENS, JJ.; and SCHULTHEIS, J. Pro Tem., concur.

SANDERS, J. (concurring) — I concur with the majority's disposition of these cases, but not with all of its analysis.

The majority's *Gunwall*[13] analysis confuses privileges and immunities with equal protection, whereas section IV of the majority opinion more properly addresses the privileges and immunities issue.

Although the majority concedes the obvious, the Washington Constitution's privileges and immunities clause, article I, section 12, has a meaning separate and distinct from the *equal protection clause* of the fourteenth amendment to the United States Constitution, the true comparison should be the privileges and immunities clause of the United States Constitution (*see* article IV, section 2; amendment XIV, section 1), not the equal protection clause. Building on this error, the first part of the majority opinion allows the analytic framework of federal equal protection review to hold sway over its review of these parties' article I, section 12 privileges and immunities challenges. *See, e.g.*, majority at 805, 806-07. This approach is inconsistent with *State v. Vance*, which holds article I, section 12 is analogous to the federal privileges and immunities clause. 29 Wash. 435, 458, 70 P. 34 (1902). It is also inconsistent with much of the majority's analysis under section IV of its opinion where it recognizes the correct approach to challenges brought under this section is to first identify whether the right in question is a "privilege" or "immunity" within the scope of the clause and, if so, whether it has been denied. *See State v. Smith*, 117 Wn.2d 263, 288, 814 P.2d 652 (1991) (Utter, J., concurring).

The majority's tilt toward equal protection is also apparent from its frequent reference to favoritism of one "class" over another. *See* majority at 807, 812 ("For a violation of article I, section 12 to occur, the law, or its application, must confer a privilege to a class of citizens."). Although a privilege or immunity violation may be class based, the text of article I, section 12 also protects "any citizen" as well as a "class of citizens." Ultimately factors regarding discrimination between classes of citizens, however, have nothing

---

[13] *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986).

whatsoever to do with this case since the majority opines, correctly I believe, before we consider disparate treatment we must first determine if the right or disability in question is in fact a "privilege" or "immunity," which this isn't. *See* majority at 812-13.

For this reason I find the majority's bluster about populist suspicions against concentrations of wealth in the private sector (majority at 808) irrelevant to the text of the clause which pertains solely to state action that abridges the individual right to enjoy the "privileges and immunities" secured by virtue of his state citizenship. The majority's approach in this regard is also inconsistent with its own reference to "a fundamental attribute of an individual's national or state citizenship" as the threshold to a privileges and immunities analysis. Majority at 813.

The majority's citation to the *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36, 81, 21 L. Ed. 394 (1872), for the proposition that the federal "equal protection clause . . . was primarily concerned with preventing discrimination against former slaves" (majority at 808) is quite puzzling as I would think the relevance of that case to the present analysis is its treatment of the Fourteenth Amendment's privileges and immunities clause, which limits those privileges and immunities to those secured by national, as opposed to state, citizenship. Historically the understanding of privileges and immunities developed well before the abolition of slavery. Surely one motivation for the Fourteenth Amendment was the desire to ensure no United States citizen, including freed slaves, be denied the privileges and immunities belonging to all United States citizens. But the issue decided there, many argue incorrectly, was whether the facts of that case involving a municipal attempt to franchise or limit butchers from plying their trade violated the federal (not state) privileges and immunities clause. Had that case been decided under the Louisiana Constitution the outcome might have been quite different.

The majority's *Gunwall* analysis not only errs by comparing the state privileges and immunities clause with the federal equal protection clause but also, in my opinion, is incorrect when it attempts to generally distinguish the federal from the state constitution by claiming the former is "a grant of enumerated powers," whereas the latter serves *"to limit the sovereign power, which directly lies with the residents and indirectly lies with the elected representatives."* Majority at 811 (emphasis added). Although there is confused dicta to this effect in some of our case law, I suggest under our state constitution "sovereignty" is plainly and *exclusively* vested not in the government created by the state constitution but in the sovereign people who ratified the constitution. There the people delegated limited power to the state government through the constitution to "protect and maintain individual rights," article I, section 1, and to do such other things as may be expressly called out, e.g., provide for the public education, etc. *See, e.g.,* Const. art. IX, § 2. My objection to this oft-repeated heresy is detailed in Richard B. Sanders & Barbara Mahoney, *Restoration of Limited State Constitutional Government: A Dissenter's View*, 59 N.Y.U. Ann. Surv. Am. L. 269 (2003). I can find no Washington authority which explains much less defends the false distinction enunciated by the majority, whereas *Maynard v. Valentine*, 2 Wash. Terr. 3, 3 P. 195 (1880) quite succinctly draws the distinction between the unlimited power of the British parliament in contrast to the uniquely American scheme which recognizes sovereignty in the people, and the subservient, limited role of government.[14]

---

[14]

A legislature with undefined powers has all legislative powers. It can lay down the law in every direction, moulding all persons and things, and each particular person and thing conclusively to what it says, determining absolutely and finally every question by its fiat. Its voice is the voice of the governing power, and the voice of the governing power is the voice of God. From that there is no appeal. Great Britain's Parliament is an example of such a Legislature. . . . American legislatures are different, simply because limited. Higher legislation than any one of them is capable of has at one breath called them into being and circumscribed their activities. The National and State legislatures have their bounds set by what the people have enacted in the National and State constitutions.

*Maynard v. Valentine*, 2 Wash. Terr. 3, 13-14, 3 P. 195 (1880).

The only specific question remaining is therefore whether the unique right of a property owner to petition for annexation of his or her property into a municipality is either a "privilege" or "immunity" within the scope of article I, section 12. Like the federal privileges and immunities clause, the scope of the state privileges and immunities clause narrowly concerns certain personal rights of universal character. *Corfield v. Coryell*, 6 F. Cas. 546, 551 (C.C.E.D. Pa. 1823) (No. 3230); *Vance*, 29 Wash. at 458. "[A]t the time the Fourteenth Amendment was adopted" (and thus also at the time the Washington Constitution was enacted), the "people understood that 'privileges or immunities of citizens' were fundamental rights, rather than every public benefit established by positive law." *Saenz v. Roe*, 526 U.S. 489, 527, 119 S. Ct. 1518, 143 L. Ed. 2d 689 (1999) (Thomas, J., dissenting). The only rights that fall within the scope of article I, section 12 are "fundamental rights which belong to the citizens of the state by reason of such citizenship," such as "the right to remove to and carry on business therein; the right, by usual modes, to acquire and hold property, and to protect and defend the same in the law; the rights to the usual remedies to collect debts, and to enforce other personal rights; and the right to be exempt, in property or persons, from taxes or burdens which the property or persons of citizens of some other state are exempt from." *Vance*, 29 Wash. at 458.

Important rights such as "the right of suffrage or of eligibility to office," are not fundamental personal rights of citizenship guaranteed by the privileges and immunities clause, as states may require a period of residency or ownership of property before conferring such rights. *Abbot v. Bayley*, 23 Mass. (6 Pick.) 89, 92, 1827 Mass. LEXIS 15, 1827 WL 2225. Accordingly the right to participate in an annexation proceeding is not a fundamental right of state citizenship either, and the state or local governments may restrict or even eliminate that right without running afoul of article I, section 12.

This claim must therefore fail. On that, at least, I agree with the majority.

Reconsideration denied May 14, 2004.